# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 2, 2013

No. 10-10211

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

DARREN L. REAGAN, also known as Dr. Darren L. Reagan; D'ANGELO LEE; DONALD W. HILL, also known as Don Hill; SHEILA D. FARRINGTON, also known as Sheila Hill,

Defendants – Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before JONES and CLEMENT, Circuit Judges, and KAZEN[*], District Judge.

EDITH BROWN CLEMENT, Circuit Judge:

Donald Hill, D'Angelo Lee, Sheila Farrington, and Darren Reagan (the "appellants") appeal on numerous grounds their convictions and sentences in this case involving substantial and wide-ranging public corruption charges related to government-subsidized development projects in Dallas, Texas. We AFFIRM the judgment of the district court.

## FACTS AND PROCEEDINGS

### A. Procedural background

---

[*] District Judge of the Southern District of Texas, sitting by designation.

No. 10-10211

The appellants were four of fourteen defendants indicted by a federal grand jury on September 27, 2007. During the time period covered by the indictment, roughly 2003 through 2005, Donald Hill was an elected member of the Dallas City Council, representing a South Dallas district. City Council members had the power to nominate members of a number of city commissions, including the City Plan and Zoning Commission ("CPC"). On Hill's nomination, the City Council appointed D'Angelo Lee to the CPC in October 2003. Sheila Farrington, Hill's mistress and later his wife, purported to work as a consultant using the business name Farrington & Associates. Darren Reagan was the chairman and chief executive of the Black State Employees Association of Texas ("BSEAT") and the BSEAT Community Development Corporation ("BSEAT CDC").

The indictment alleged that the appellants had been involved in various capacities in illegal schemes related to attempts by two housing developers, Brian Potashnik and James "Bill" Fisher, to obtain public financing, zoning clearance, and political support for their rival housing development plans in Dallas. Specifically, Count 10 of the indictment charged Hill, Lee, and Farrington with having conspired to solicit bribes from Potashnik, in violation of 18 U.S.C. §§ 371 and 666. Counts 11 and 12 charged Hill and Lee with having solicited bribes from Potashnik, in violation of § 666, and Farrington with having aided and abetted the bribery. Count 15 charged Hill, Lee, Farrington, and Reagan with having conspired to extort Fisher, in violation of 18 U.S.C. § 1951. Count 16 charged Hill and Lee with extorting Fisher, in violation of § 1951, and Farrington and Reagan with aiding and abetting that extortion. Count 17 charged Hill and Reagan with a separate instance of extorting Fisher, in violation of § 1951. Count 18 charged Hill, Lee, and Farrington with honest services fraud, in violation of 18 U.S.C. § 1346. Count 19 charged Hill, Lee, and Farrington with having conspired to commit money laundering, in violation of

2

No. 10-10211

18 U.S.C. § 1956(h), with respect to the funds obtained from bribery. Count 20 charged Hill and Reagan with the same with respect to the funds obtained from extortion.

The appellants proceeded to trial, which commenced on June 22, 2009, and stretched over the course of 47 days, concluding on September 23.[1]

## B. Summary of the evidence

Among many other witnesses, both Fisher and Potashnik testified for the Government at trial. Fisher had cooperated extensively with the FBI during the investigation, while Potashnik had been charged in the same indictment as the appellants and pled guilty to a single count of conspiracy to commit bribery.

The Government's evidence showed that, in order to obtain Hill's political support for his housing developments, Potashnik agreed to hire Farrington as a community consultant. Potashnik regularly paid Farrington, through a bank account set up in the name of Farrington & Associates, despite Farrington never having done any work for him. Hill and Lee also demanded that Potashnik involve various non-profit organizations in his developments, and these organizations then remitted part of their fees to Farrington through her Farrington & Associates account. Farrington used money from this account to buy cars for Hill and Lee and made cash withdrawals from the account for Lee. In return for Potashnik's cooperation, Hill, among other acts, pushed the City Council to approve a financing deal for one of Potashnik's housing developments.

Lee also demanded that Potashnik agree to use a certain percentage of minority labor in the construction of one of his developments. To that end, Lee instructed Potashnik to hire a woman named Andrea Spencer as a minority

---

[1] Of the other ten defendants named in the indictment, seven pled guilty. One, Rickey Robertson, pled not guilty and was tried alongside the appellants but has not appealed the judgment against him. Robertson was convicted on Counts 15 and 19. The final two defendants pled not guilty and were tried separately.

3

No. 10-10211

contractor. Spencer herself did no contracting work, but instead partnered with a contractor named Ron Slovacek, a white male, to do the work she obtained as a result of her minority contractor certification. Potashnik gave Spencer and Slovacek an $800,000 concrete contract. Shortly thereafter, Hill pushed the City Council for tax credit funding for two of Potashnik's developments, and Lee helped Potashnik obtain a permit to build a community center and swimming pool at one of his developments. Slovacek eventually admitted to Spencer that he was remitting 10% of every check he received through this scheme to Lee, much of it through checks made out to Farrington.

Potashnik had further dealings with Lee and Hill with respect to a proposal before the City Council that would have reduced the number of rent-restricted apartments required in three of his developments.[2] Potashnik told Lee that he would work out a deal with Spencer and Slovacek on a new concrete contract, despite their bid being $250,000 higher than competitors' bids. In return, Lee told Potashnik that he and Hill would ensure that the City Council proposal passed and had a conversation with Hill in which he confirmed this arrangement. When the measure failed to pass the City Council, Potashnik refused to give the concrete contract to Spencer and Slovacek, and his relationship with Lee and Hill irreparably broke down.

While these machinations with respect to Potashnik were ongoing, the appellants were also involved in illegal schemes related to Potashnik's rival, Fisher. Beginning in August 2004, Reagan began asking Fisher for lump sums of money and percentages of the general partner developer's fee that Fisher

---

[2] This measure would have made the expiration of the consent decree that settled a number of public housing desegregation cases (the "Walker Consent Decree") retroactively applicable to Potashnik's developments. The Walker Consent Decree had the effect of requiring a certain percentage of highly-rent-restricted units in every subsidized affordable housing project. *See generally Walker v. U.S. Dep't of Hous. & Urban Dev.*, 912 F.2d 819, 821-23 (5th Cir. 1990).

received on each of his developments. Reagan frequently referenced Hill in his conversations with Fisher. Reagan indicated that, if Fisher involved Reagan in his development plans, Reagan would ensure that Fisher would not have problems with Hill and the City Council. Hill, on one occasion, also told Fisher that he needed to work out his problems with Reagan in order to resolve issues related to one of his developments.

On October 27, 2004, Fisher suffered a number of adverse zoning rulings. A few days later, Lee asked Fisher to contribute money to fund Hill's birthday party. Fisher refused, and shortly thereafter a CPC vote affecting Fisher was postponed. Reagan continued to make demands of Fisher, requesting that his wife and parents be given community outreach jobs by Fisher. On November 10, Fisher signed a contract for $100,000 with Reagan, and Hill then shepherded through the City Council a motion to approve financing for one of Fisher's developments, Pecan Grove.

Then Fisher was called by two men, Rickey Robertson and Jibreel Rashad, who had recently formed an entity called RA-MILL, LLC. Neither Robertson nor Rashad had substantial prior experience as contractors. Robertson told Fisher that Lee had referred him to Fisher and that RA-MILL was interested in serving as a subcontractor on Fisher's Pecan Grove project. Robertson later told Fisher that Lee was a silent partner in RA-MILL and that, if Fisher hired RA-MILL, Lee would speed approval for another one of Fisher's projects, Dallas West Village, through the CPC, after which Hill would support the project before the City Council. Lee later helped bring Dallas West Village through the CPC process.

On December 29, Fisher met with Lee and Hill to discuss ongoing zoning issues. At that meeting, Lee and Hill encouraged him to sign contracts with RA-MILL. The next day, Robertson and Rashad sent Fisher one-page contracts obligating him to pay RA-MILL a fee of 10% of the total value of the projects

they had proposed they be cut in on. This 10% fee would have amounted to between $600,000 and $800,000. Fisher rejected the contracts, and Robertson told him that Lee wanted the contracts signed before an upcoming CPC zoning vote. A week later, on discovering that Robertson and Rashad were planning to subcontract out all of the work that Fisher would give them, Fisher refused to deal with them further. He then received two proposals from RA-MILL: either he could give RA-MILL contracts for concrete and drywall work and pay an initial contractor fee of $180,000, or he could pay RA-MILL 3% of the total construction cost of his projects in return for RA-MILL not pursuing any further work on them. Robertson told Fisher that Lee was in support of these proposals, although Lee, fearing that he was being recorded, later denied that he had been involved in their formulation.

Around this time, as the Pecan Grove project began to progress, Reagan began invoicing Fisher for additional sums of money. Reagan told Fisher that Lee and Hill had told him to coordinate his activities with respect to Pecan Grove with RA-MILL's. To this end, Fisher received invoices from Reagan demanding $180,000 for RA-MILL for construction consulting services and $30,000 for Reagan. Reagan told Fisher that if Fisher did not make the payments Reagan would make a report to the City Council. After Fisher did not pay the invoices, Hill delayed a City Council zoning vote on one of Fisher's projects.

On February 16, 2005, Reagan sent a letter to Fisher demanding 50% of the developer's fee for both the Pecan Grove project and the Dallas West Village project for which Fisher was trying to get approval. Fisher estimated this demand as amounting to $1.4 million per project. Reagan also named subcontractors that he wanted Fisher to use. Fisher told Reagan that he could not agree to these new terms, and in a phone call a few days later Reagan told Hill that Fisher had been "waffling," that he needed Hill to "pull it," and that he

had told Lee that "we gonna hold the line." Hill responded that he was "waiting to hear from you. I'm just waiting for you."

Even though he had refused Reagan's new terms, Fisher did pay Reagan $22,500, through Reagan's organization BSEAT, as partial payment on Reagan's previous invoices. The FBI then photographed Reagan giving Hill an envelope containing $10,000 on February 22. Hill then gave $5,000 to Farrington, who gave $2,500 to Lee in cash. As Hill continued to delay votes on Fisher's Dallas West Village development, Reagan continued to demand more money. Fisher paid Reagan an additional $40,000 on March 7. The FBI photographed Reagan giving $7,000 to Lee, and the next day $2,500 in cash was deposited into Hill's campaign account. Fisher continued to refuse to cut Reagan in on his developer's fees, though, and Hill continued to postpone votes on the Dallas West Village development.

Finally, Fisher was put in touch with Kevin Dean, who owned an asphalt company, and John Lewis, an attorney. Dean and Lewis told him that by working with them he could get City Council approval for Dallas West Village. On May 11, the day of a City Council vote on the Dallas West Village development, Fisher signed an agreement with Dean's company and signed a contract with Lewis for legal work amounting to $250,000. After Fisher paid Lewis $50,000 as an initial payment, Lewis text messaged Hill, "Everything is signed! Approve the project!!!" That day, Hill successfully moved for zoning approval for Dallas West Village in a City Council meeting.

## C. Verdict and judgment

The jury deliberated from September 23 through October 5, 2009, before returning its verdict. The jury found Hill, Lee, and Farrington guilty to Count 10 (bribery conspiracy); Hill and Lee guilty, and Farrington not guilty, to Count 11 (bribery); Hill and Lee guilty to Count 12 (bribery), and Farrington guilty to aiding and abetting; Hill, Lee, Farrington, and Reagan guilty to Count 15

No. 10-10211

(extortion conspiracy); Hill and Lee guilty to Count 16 (extortion), with Farrington and Reagan guilty to aiding and abetting; Hill and Reagan not guilty to Count 17 (extortion); Hill, Lee, and Farrington guilty to Count 18 (honest services fraud); Hill, Lee, and Farrington guilty to Count 19 (conspiracy to launder money); and Hill and Reagan not guilty to Count 20 (conspiracy to launder money). The district court later entered a judgment of acquittal on Count 18. The district court sentenced Hill to 216 months' imprisonment, Lee and Reagan to 168 months' imprisonment, and Farrington to 108 months' imprisonment.

## DISCUSSION

The appellants appeal on numerous grounds. (A) All four challenge the sufficiency of the evidence presented with respect to their various convictions. (B) Reagan contends that his right to a speedy trial was violated. (C) Reagan contends that the district court erred by not holding a hearing into potential conflicts of interest among defense counsel and into alleged prosecutorial misconduct. (D) Hill, Farrington, and Reagan argue that the district court erred by sealing the courtroom during voir dire and during a post-verdict discussion with a juror. (E) Reagan argues that the district court erred in permitting him to waive a challenge to the Government's purportedly racially discriminatory use of peremptory strikes during jury selection. (F) Lee and Reagan challenge a number of the district court's evidentiary rulings, specifically its limiting the scope of permissible cross-examination of Fisher and by allowing evidence related to Reagan's prior business dealings. (G) Reagan contends that the district court judge should have recused herself because she presided over a previous case involving Fisher. (H) Reagan contends that the district court erred in failing to sever his trial from that of his co-defendants. (I) Hill and Farrington charge that the Government committed prosecutorial misconduct during closing

8

argument, necessitating a new trial. (J) Finally, Lee and Reagan challenge a number of the district court's sentencing decisions.

## A. Evidentiary sufficiency

### 1. Standard of review

When a defendant raises a "sufficiency argument in a motion for judgment of acquittal, we review the district court's denial of that motion by examining the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict, and asking whether a rational trier of fact could have found guilty beyond a reasonable doubt." *United States v. Montes*, 602 F.3d 381, 388 (5th Cir. 2010). "A jury is free to choose among reasonable constructions of the evidence," *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982), and "[o]ur role does not extend to weighing the evidence or assessing the credibility of witnesses," *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996).

When a defendant raises a sufficiency argument in a motion for a new trial, we review the district court's decision to grant or deny a new trial for "clear abuse of discretion." *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997) (quoting *United States v. Dula*, 989 F.2d 772, 778 (5th Cir. 1993)). For a district court to disturb a jury's verdict and order a new trial, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.*

### 2. Bribery

It is illegal for any agent of a local or state government that receives in excess of $10,000 from any federal program to "corruptly solicit[] or demand[] for the benefit of any person, or accept[] or agree[] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such . . . government . . . involving any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B), (b). Lee, Hill, and Farrington were all convicted under this section of conspiracy to

commit bribery for their machinations with respect to Potashnik. Lee and Hill were convicted of two substantive counts of bribery for the deals they arranged first for Farrington and second for Spencer and Slovacek. Farrington was convicted of aiding and abetting one of these instances of bribery. These three defendants challenge the sufficiency of evidence presented against them on these counts.

### a. Hill

Hill challenges his convictions on Counts 11 and 12, the two substantive bribery charges, and on Count 10, the bribery conspiracy charge, on the ground that the evidence presented at trial failed to show that he intended to be influenced to change his official conduct as a result of his knowledge of Potashnik's payments to Farrington, Spencer, and Slovacek. Furthermore, he argues that the evidence presented at trial was consistent with him being a mere bystander "to Lee's machinations."

The evidence presented at trial contradicts this framing of Hill's role in the conspiracy. Potashnik testified that he expected that Hill would take various official actions in his favor as a result of the bribes he was paying, and Hill's actions support Potashnik's view of the arrangement. Hill made a number of votes favorable to Potashnik shortly after Potashnik agreed to make various payments to Hill's co-conspirators. For instance, while he had voted to postpone a vote on one of Potashnik's development proposals on October 13, 2004, Hill voted in Potashnik's favor on October 27, shortly after Potashnik made his first payment to Farrington on October 22 and agreed to other concessions requested by Hill and Lee. On January 4, 2005, after Potashnik awarded concrete contracts to Spencer and Slovacek, Hill wrote letters to a Texas state agency supporting tax credit financing for two of Potashnik's developments.

Based on Potashnik's testimony as to his own subjective belief and Hill's subsequent actions tending to confirm that belief, a reasonable jury could have

inferred that Hill did in fact intend to be influenced in his official actions by Potashnik's bribery, and as a result Hill's evidentiary insufficiency argument on these counts is unavailing.

### b. *Farrington*

Farrington asserts that there was insufficient evidence to convict her either of conspiring to commit bribery or of aiding and abetting bribery. She argues that she did not know that the conspiracy existed and thus could not have joined it, and that she had no knowledge that the bribery was ongoing and thus could not have aided and abetted it. She contends that she believed that her contracts with Potashnik were for legitimate consulting services only.

The Government presented ample evidence tending to show that Farrington knew that she was not engaged in a legitimate consulting business in her dealings with Potashnik. In one recorded phone call between Farrington and Hill, for example, Farrington stated that she was "just going to work [the contract with Potashnik] like a real consultant," implying that she was not in fact "a real consultant." Farrington communicated with Lee and Hill about the status of the checks she was receiving from Potashnik, and they in turn communicated with Potashnik about these checks. Furthermore, despite being paid purportedly for consulting services, Potashnik testified that Farrington never did any work for him, and that the only time he met with her after retaining her as a "consultant" was on a single occasion when she tried to get him to hire one of her associates. He stated that the only communications he ever received from her were monthly summary invoices, which provided no details as to what if any work she was doing, and on which his name was often misspelled.

We conclude that the evidence presented against Farrington—namely her communications with Lee and Hill and Potashnik's testimony that she did no actual work for him—was sufficient to allow a reasonable jury to find that she

had knowingly joined the conspiracy and aided and abetted the substantive acts of bribery.

### c. Lee

Lee contends that the evidence presented against him on the bribery counts was insufficient, as the Government introduced no evidence tending to show a connection between the bribes paid and any federal money received by the city of Dallas.  He argues that the requirement of such a nexus is implied by the Supreme Court's decision in *Salinas v. United States*, 522 U.S. 52, 57-59 (1997).

Because Lee did not challenge this aspect of the Government's case against him before the district court, our review is for plain error only.  *See* FED. R. CRIM. P. 52(b).  Under this or any other standard, Lee's argument is precluded by the Supreme Court's decision in *Sabri v. United States*, in which the Court stated "that not every bribe or kickback offered or paid to agents of governments covered by § 666(b) will be traceably skimmed from specific federal payments," and held that the lack of a closer nexus requirement did not render the statute unconstitutional or otherwise invalid.  541 U.S. 600, 605-06 (2004).  Lee's argument is unavailing.

### 3. Money laundering

18 U.S.C. § 1956 prohibits a range of financial transactions involving the proceeds of unlawful activity, including transactions designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," *id.* § 1956(a)(1)(B)(i), or "to avoid a transaction reporting requirement under State or Federal law," *id.* § 1956(a)(1)(B)(ii).  Similarly, 18 U.S.C. § 1957(a) prohibits engaging in a monetary transaction involving criminally-derived property of a value greater than $10,000.  18 U.S.C. § 1956(h) prohibits conspiring to commit any offense contained in § 1956 or § 1957.

12

No. 10-10211

Lee, Hill, and Farrington were convicted of conspiring to commit money laundering under these subsections for transactions made via the Farrington & Associates account, through which Farrington was receiving and disbursing money from Potashnik, the non-profits Potashnik had included in his developments, and a number of other sources.

Hill and Farrington challenge the sufficiency of the evidence supporting their convictions under Count 19 for conspiring to launder money. They argue that the money paid to Farrington did not constitute the proceeds of unlawful activity at the time that it was deposited into the Farrington & Associates account. They contend that, at the time of the deposits, the money had not reached Hill, and the underlying bribery offenses had thus not yet been completed. They further assert that the transactions undertaken, if anything, constituted the bribery offenses themselves, and not an effort to conceal the proceeds of those offenses.

These arguments are unavailing. Under § 666, a bribery offense is completed as soon as a government agent "corruptly solicits or demands for the benefit of any person . . . anything of value" with the requisite intent to be influenced. § 666(a)(1)(B). As a result, a substantive count of bribery was completed as soon as Hill solicited payments from Potashnik. By the time Farrington received the payments they were the proceeds of this unlawful activity. Moreover, the notion that Hill never received any money is incorrect, as the Government presented ample evidence showing that he and Lee directed Farrington's deposits and withdrawals from the Farrington & Associates account and therefore had constructive possession over the funds in that account. Under our caselaw, a defendant can constructively possess funds in the money laundering context once he has effective control over that money, even if it remains in a third party's account. *See United States v. Nguyen*, 504 F.3d 561, 570-71 (5th Cir. 2007).

13

No. 10-10211

The Government also presented ample evidence that the purpose of the Farrington & Associates account was to conceal the money being paid to the appellants as a result of their unlawful activities.  For example, Lee and Hill managed the transfer of money into and out of the account, even though it was nominally Farrington's.  On one occasion, Hill told Farrington to withdraw $9,000 instead of $10,000 for Lee in order to avoid reporting requirements triggered by the higher sum, which in and of itself constituted a violation of § 1956(a)(1)(B)(ii).  Farrington & Associates money was used to buy a BMW for Hill, which was left titled in the name of Farrington & Associates.  Hill told Farrington to say that the car was a "retainer" for her lawyer, even though this was not true.

Based on this evidence, a reasonable jury could have inferred that Hill and Farrington conspired to launder the proceeds of unlawful bribery through the use of the Farrington & Associates account, in violation of § 1956(h).

*4. Extortion*

The Hobbs Acts prohibits, *inter alia*, the interference in interstate commerce by extortion, with extortion defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. §§ 1951(a), (b)(2).  The Government alleged two theories of Hobbs Act liability: that the appellants had conspired to obtain and had obtained money from Fisher through the use of fear, or alternatively that they had done so under color of official right.  "'Fear of economic loss' may underlie extortion" charges so long as the loss is particularized and not merely a loss of a prospective future benefit, *United States v. Rashad*, 687 F.3d 637, 642 (5th Cir. 2012) (quoting *United States v. Edwards*, 303 F.3d 606, 635-36 (5th Cir. 2002)), and private individuals can be convicted for extortion "under color of official right" when they "conspire[] with

14

corrupt public officials, masquerade[]  as public officials . . . or [speak] for a public official," *id.* at 643.

### a. Hill, Lee, and Reagan

Hill, Lee, and Reagan challenge the sufficiency of the evidence supporting their convictions on Count 15, which charged them with conspiring to commit extortion, and Count 16, which charged Hill and Lee with extortion and Reagan with aiding and abetting extortion, all pursuant to the Hobbs Act.

They advance various arguments for why the evidence presented was legally insufficient, including that their actions were merely "hard bargaining" with Fisher, any payments they obtained were not received "under color of official right," Fisher voluntarily associated himself with Reagan, there were legitimate reasons for opposing Fisher's proposed developments, Fisher was never threatened with a complete shutdown of his business,  Fisher only stood to lose a prospective economic benefit, and Fisher was successful despite their actions.

We reject these characterizations of the relationship between the appellants and Fisher.  The evidence presented at trial, including Fisher's testimony, amply demonstrated that Fisher signed his contracts with Reagan out of fear of the economic loss that would result from Hill and Lee taking further action against him, and that he stood to lose significant investments he had already made in his affected development projects, Pecan Grove and Dallas West Village.  Fisher testified that Lee told him that if he did not make certain payments his developments would be held up, and Lee and Hill did in fact vote against Fisher and delay various votes related to his projects.  Reagan, Lee, and Hill communicated about the status of Fisher's payments to Reagan and the need to "hold the line" until Fisher complied with Reagan's demands.  On February 22, 2005, and on March 7, 2005, the FBI photographed Reagan passing cash to Hill and Lee after he received payments from Fisher through BSEAT.

No. 10-10211

This evidence, considered along with the rest of the trial record, amply supports the jury's verdict that Hill, Lee, and Reagan conspired to obtain money from, and did in fact succeed in obtaining money from, Fisher as a result of his fear of economic loss if he did not comply with their demands, or under color of official right.[3]

Lee and Reagan also argue for the first time on appeal that the Government did not introduce sufficient evidence of the transactions' impact on interstate commerce to meet the Hobbs Act's jurisdictional nexus. However, they stipulated to this element at trial and agreed to a jury instruction stating that they had stipulated to it. The presence of such a stipulation defeats any evidentiary insufficiency argument with respect to the interstate nexus element. *United States v. Branch*, 46 F.3d 440, 442 (5th Cir. 1995) ("Once a stipulation is entered, even in a criminal case, the government is relieved of its burden to prove the fact which has been stipulated by the parties. . . . Appellant . . . cannot now claim that the government failed to offer evidence on an element to which he confessed.").

### b. Farrington

Farrington also challenges the sufficiency of the evidence supporting her conviction under Count 16 for having aided and abetted the extortion of Fisher. She argues principally that there was no evidence introduced showing that she even knew of any extortion scheme, much less formed the requisite intent to aid and abet it, that she did not in fact aid and abet any extortion scheme, and that any extortion scheme was completed prior to any of her related acts, rendering her aiding and abetting any extortion scheme a legal impossibility. These arguments are unavailing in light of the evidence presented at trial.

---

[3] We have already upheld the extortion conspiracy conviction of one of the appellants' co-conspirators, Jabreel Rashad, who was tried separately, on these two grounds on the basis of a similar evidentiary record. *Rashad*, 687 F.3d at 642-43.

16

No. 10-10211

Documents related to the extortionate conduct directed at Fisher were found in Farrington's apartment. Specifically, authorities found a BSEAT invoice that Reagan had sent to Fisher, along with copies of the contracts Reagan had attempted to get Fisher to sign, a letter from Reagan to Fisher relating to these contracts, and a copy of a check Fisher had given to Reagan. Additionally, on February 22, 2005—less than two hours after Reagan, who had just received $22,500 from Fisher through BSEAT, passed Hill $10,000 in cash—Farrington deposited $5,000 that she received from Hill into the Farrington & Associates account. Farrington then gave $2,500 to Lee.

Based on the documents and her close relationship with Hill and Lee, a reasonable jury could have concluded that she was aware of the extortion scheme. A reasonable jury could also have concluded that she knowingly served as a conduit for the transfer of money between Reagan, Hill, and Lee. Because the extortion scheme involved payments to Hill and Lee to forestall their taking negative actions against Fisher, a reasonable jury could have concluded that the extortion was not completed prior to the final payment to Lee and found that Farrington had aided and abetted an act of extortion. As a result, we hold that there was sufficient evidence to support Farrington's conviction on this count.

### 5. *New trial*

Farrington moved the district court for a new trial based on the weight of the evidence, pursuant to Federal Rule of Criminal Procedure 33. The district court denied her motion, and she now argues that the district court's decision was an abuse of discretion. Because we hold that the evidence amply supported Farrington's convictions and that the evidence did not "preponderate heavily against the verdict," *Robertson*, 110 F.3d at 1118, we decline to find an abuse of discretion in the district court's denial of her motion for a new trial.[4]

---

[4] Hill argues that he too should be granted a new trial, but concedes that he did not file a motion requesting one. Because a "district court is 'powerless to order a new trial except on

### B. *Speedy trial*

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. CONST. amend. VI. "The Speedy Trial Act of 1974 provides that, in 'any case in which a plea of not guilty is entered, the trial . . . shall commence within seventy days' from the later of (1) the 'filing date' of the information or indictment or (2) the defendant's initial appearance before a judicial officer." *United States v. Tinklenberg*, 131 S. Ct. 2007, 2010 (2011) (citation omitted) (quoting 18 U.S.C. § 3161(c)(1)). Reagan's initial appearance was on October 1, 2007, and his trial did not commence until June 22, 2009, a gap of 628 days. Reagan contends that this delay in bringing him to trial deprived him of his constitutional and statutory rights.

Reagan did not move for dismissal of his indictment before the district court on the basis of a Speedy Trial Act violation, and he has therefore waived his statutory claim. *See* 18 U.S.C. § 3162(a)(2); *see also United States v. Westbrook*, 119 F.3d 1176, 1186 (5th Cir. 1997) (holding a Speedy Trial Act claim waived when a defendant failed to join his co-defendant's motion to dismiss the indictment). Although the Supreme Court has held that a defendant does not waive his constitutional right to a speedy trial by failing to raise it before the district court, we consider constitutional speedy-trial arguments raised for the first time on appeal for plain error only. *See United States v. Serna-Villareal*, 352 F.3d 225, 231 (5th Cir. 2003).

In assessing a defendant's claim that he was deprived of his constitutional right to a speedy trial, this court considers four factors: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). "Once a speedy trial

---

the motion of the defendant,'" *United States v. Nguyen*, 507 F.3d 836, 838 (5th Cir. 2007) (quoting *United States v. Brown*, 587 F.2d 187, 189 (5th Cir. 1979)), as a matter of law he cannot be entitled to relief on this ground.

analysis is triggered, the court 'determines whether the first three *Barker* factors weigh so heavily in favor of the defendant that prejudice is presumed.'" *United States v. Bishop*, 629 F.3d 462, 465 (5th Cir. 2010) (quoting *United States v. Frye*, 489 F.3d 201, 209 (5th Cir. 2007)).  In the absence of such a presumption, the defendant must affirmatively demonstrate prejudice.  *See United States v. Molina-Solorio*, 577 F.3d 300, 307 (5th Cir. 2009).

With respect to the length of the delay, in *United States v. Parker*, 505 F.3d 323 (5th Cir. 2007), we held that delays of less than five years cannot alone support a presumption of prejudice.  *Id.* at 328-29.  The second and third *Barker* factors both militate against a presumption of prejudice: the delay was partially attributable to Reagan's requests for two continuances owing to the complexities of the case, which the district court granted, *see Cowart v. Hargett*, 16 F.3d 642, 647 (5th Cir. 1994) ("Where the state advances valid reasons for the delay, or the delay is attributable to acts of the defendant, this factor is weighed in favor of the state."), and Reagan never asserted his right to a speedy trial.  Because none of these factors supports a presumption of prejudice, and because the delay was not long enough to require a presumption of prejudice by itself, we do not presume prejudice.  Reagan bore the burden of showing that he was prejudiced by the delay in bringing him to trial.  *Molina-Solorio*, 577 F.3d at 307.  As Reagan has not argued that he was actually prejudiced by the delay, his constitutional speedy trial claim fails.

## C. *Conflict of interest/prosecutorial misconduct*

We review a district court's decision not to hold an evidentiary hearing into an alleged conflict of interest for abuse of discretion. *United States v. Garza*, 429 F.3d 165, 171 (5th Cir. 2005).  A district court's decision as to whether such a conflict actually exists is a legal question that we review *de novo. Id.*  Where a district court does find a conflict of interest between a defendant and his counsel, it "must conduct what is commonly known as a '*Garcia* hearing' to

ensure a valid waiver by the defendant of his Sixth Amendment right." *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006) (citing *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975)).

During trial, Reagan made three allegations of conflicts to the district court in *pro se* letters, and he asserts the district court should have held hearings to investigate them. First, he contends that a conflict of interest existed between him and Hill's counsel, because Hill's counsel was also representing a man named Autry, who had, "with his gang dressed in law enforcement uniforms, broke into, and invaded, Reagan's home," with the complicity of law enforcement. Second, he alleges that he and Fisher had both at times used the same attorney prior to that attorney's death a few months before the start of trial. Third, he asserts that the marriage of one of the Government's prosecutors to a partner at the law firm that represented Fisher merited further investigation by the district court.

The district court did not abuse its discretion by failing to hold a *Garcia* hearing into, or to otherwise investigate, any of these claims, as none presented an instance of conflicted counsel that would have necessitated such a hearing on Sixth Amendment grounds, or required an investigation with respect to any other type of conflict of interest. First, even assuming that Hill's attorney did represent Autrey, and assuming that Autrey did in fact break into Reagan's home, there still was no conflict requiring investigation as Hill's attorney at no point represented Reagan. *Cf., e.g., United States v. Holley*, 826 F.2d 331, 334 (5th Cir. 1987) (discussing the potential for conflict arising from the appellant's counsel's representation of *both* the appellant and his co-defendant). Second, the fact that a now-deceased attorney represented Reagan and Fisher in other matters prior to the trial did not implicate Reagan's right to conflict-free counsel. *Cf. Perillo v. Johnson*, 205 F.3d 775, 801-06 (5th Cir. 2000) (discussing the conflict of interest present when a defendant's *trial counsel* also represents a

witness against the defendant).  Finally, the mere fact that the prosecutor's husband worked at a firm that represented one of the witnesses did not create a conflict, as Reagan did not show that the prosecutor or her husband had a financial stake in the outcome of Reagan's trial creating a conflict or requiring her disqualification. *Cf., e.g., United States v. Tierney*, 947 F.2d 854, 864-65 (8th Cir. 1991) (not requiring disqualification of a prosecutor whose husband's firm was representing an insurer with a financial stake in the outcome of the defendant's case because of the attenuated financial stake the husband himself had in the outcome).

We hold that the district court did not abuse its discretion in not investigating these claims further.

### D. Courtroom closure

"Waived errors are entirely unreviewable, unlike forfeited errors, which are reviewable for plain error." *United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir. 1995).  Hill, Farrington, and Reagan argue that the district court violated the Sixth Amendment by allegedly sealing the courtroom during voir dire and during a post-verdict discussion with a juror.[5]  They made this argument for the first time in a motion for a new trial filed well after their trial had concluded and over three months after the motion deadline had passed.[6]  We hold that the defendants waived their right to a public trial with respect to the proceedings in question. *See United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006) ("Where

---

[5] The record is unclear as to whether the courtroom was actually sealed during the periods in question.

[6] The appellants claim that their failure to object contemporaneously to the alleged closure of the voir dire proceedings should be excused by the Supreme Court's decision in *Presley v. Georgia*, 558 U.S. 209 (2010).  *Presley* stands for the proposition that a criminal defendant has a Sixth Amendment right to an open courtroom during voir dire. *Id.* at 213.  However, we had extended the ambit of the Sixth Amendment to cover voir-dire-related proceedings well before *Presley* in *United States v. Edwards*, 303 F.3d 606, 615-16 (5th Cir. 2002), and nothing else in *Presley* excuses the appellants' waiver of this issue.

a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a public trial.").

## E. Batson *challenge*

*Batson v. Kentucky* holds impermissible the use of peremptory challenges to exclude potential jurors on the basis of their race. 476 U.S. 79, 86-87 (1986). At the conclusion of voir dire, Reagan lodged a *Batson* challenge because the Government had used some of its peremptory challenges against black veniremen. The district court asked the Government if it had race-neutral explanations for each of the challenges in question. As the Government began to respond, the district court called a pause in the proceedings, and the parties conferred. At the conclusion of this brief conference, the district court stated on the record that it understood that the parties had come to an agreement that, in return for the Government's agreement to replace one juror with another who had been peremptorily struck, Reagan would waive his *Batson* challenge. Each of the defendants and the Government accepted this arrangement on the record.

Reagan now argues that the district court's acceptance of this arrangement was reversible error necessitating vacatur and retrial. However, when a defendant withdraws a challenge to a jury's make-up, he waives his objection thereto. *Musquiz*, 45 F.3d at 931-32 (so holding in the context of a challenge of a juror for cause). Because Reagan withdrew his *Batson* challenge, it is waived and unreviewable on appeal. *Id.* at 931.

## F. Evidentiary rulings

### 1. Standard of review

"Evidentiary rulings are reviewed for an abuse of discretion, subject to harmless-error analysis." *United States v. Crawley*, 533 F.3d 349, 353 (5th Cir. 2008). "We review alleged violations of a defendant's Sixth Amendment confrontation right *de novo* . . . subject to harmless error review." *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008) (citations omitted).

### 2. *Fisher cross-examination*

Lee and Reagan contend that the district court violated their rights under the Confrontation Clause by prohibiting cross-examination of Fisher about a bank fraud case that he had been involved in during the 1990's, in which he was at first convicted but then had his verdict overturned on appeal. *See generally United States v. Fisher*, 106 F.3d 622 (5th Cir. 1997). Fisher was acquitted on retrial and later sued the Government for malicious prosecution.

Lee and Reagan argued to the district court that information about this case should have been allowed in evidence because it related to Fisher's understanding of how investigations proceeded. They argued that this knowledge could have indicated that Fisher's cooperation with the Government was a deliberate effort at gaining an advantage over his rival, Potashnik. The district court ruled that this connection was far too tenuous to support the inclusion of Fisher's legal history in the trial and excluded it as either irrelevant or excludable under Federal Rule of Evidence 403. *See United States v. Perez-Solis*, 709 F.3d 453, 464 (5th Cir. 2013) ("Rule 403 provides that '[a]lthough relevant, evidence may be excluded if its probative value is *substantially* outweighed by the danger of *unfair* prejudice.'" (quoting FED. R. EVID. 403)).

"[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The district court's decision to restrict inquiry into an investigation over a decade old that resulted in no conviction of the witness in question, in light of the highly-attenuated conspiracy-theory-like argument as to its relevance was not in error. The district court did not abuse its discretion under Rule 403, and the district

court's decision in that respect did not violate the appellants' Confrontation Clause rights

### 3. *West Cliff Mall*

Reagan also argues that the district court erred in admitting evidence and testimony about how he had committed fraud during the sale of a shopping center, the West Cliff Mall, which he had been involved in developing. Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). Reagan contends that admission of the evidence regarding the West Cliff Mall was an abuse of discretion under Rule 404(b).

The West Cliff Mall was of great importance to Reagan's defense. He repeatedly pointed to BSEAT's involvement with the West Cliff Mall project as showing that BSEAT was a legitimate organization with deep ties to the community. In response, the Government introduced documentary evidence in the form of a contract relating to the mall and a transcript of a phone recording between Reagan, his business partner, and his partner's wife, both of which indicated that Reagan and his associates were planning to defraud the principal investor in the mall. Reagan consented to the admission of this documentary evidence.

The Government then proceeded to question Reagan's partner about the West Cliff Mall scheme, and Reagan objected, arguing that the testimony was excludable under Rule 404(b)(1). The district court held that Reagan had waived his objection by consenting to the admission of the documents, or, alternatively, that the evidence was admissible under the exception in Rule 404(b)(2), which allows for the use of evidence barred by Rule 404(b)(1) for the limited purposes of "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The district court then issued an

instruction to the jury limiting their consideration of the West Cliff Mall evidence to the purposes allowed by Rule 404(b)(2).

On appeal, Reagan contends that the West Cliff Mall evidence was irrelevant with respect to any issue other than Reagan's character and should have been excluded under Rule 404(b). However, even if Reagan is correct, he would still have to demonstrate that any error in this regard was not harmless. *See Crawley*, 533 F.3d at 353. Because a district court's issuance of a limiting instruction "greatly minimize[s]" the risk of undue prejudice posed by an erroneous admission under Rule 404(b), *id.* at 355, and because the evidence presented at trial supporting the jury's verdict was substantial, *see United States v. Hale*, 685 F.3d 522, 539 (5th Cir. 2012), we fail to see how any error in admitting the West Cliff Mall evidence was not harmless.

## G.  Judicial disqualification

For the first time on appeal, Reagan challenges the decision by the trial judge not to recuse herself *sua sponte* in light of the fact that she had presided over the malicious prosecution suit that Fisher filed after he was acquitted in his bank fraud retrial. "Any . . . judge . . . of the United States shall disqualify himself in any proceeding . . . [w]here he has . . . personal knowledge of disputed evidentiary facts." 28 U.S.C. § 455(a). Reagan argues that the judge's involvement in that case casts doubt on her impartiality because of the knowledge of Fisher she gained as a result. However, "[a]s a general rule, for purposes of recusal, a judge's '[p]ersonal knowledge of evidentiary facts means extrajudicial,' so '[f]acts learned by a judge in his or her judicial capacity regarding the parties before the court . . . cannot be the basis for disqualification.'" *Conkling v. Turner*, 138 F.3d 577, 592 (5th Cir. 1998) (second and third alterations in original) (quoting *Lac Du Flambeau Indians v. Stop Treaty Abuse-Wis.*, 991 F.2d 1249, 1255-56 (7th Cir. 1993)). Because any knowledge the judge may have had about Fisher was garnered in her judicial

No. 10-10211

capacity, disqualification was not required by § 455, and we hold Reagan's challenge to be unavailing.

### H. Severance

#### 1. Standard of review

We review for abuse of discretion the denial of a motion for severance. *United States v. Mitchell*, 484 F.3d 762, 775 (5th Cir. 2007). Where a defendant fails to move to sever, we review for plain error only whether the district court should have nevertheless severed the case. *United States v. Bernard*, 299 F.3d 467, 475 (5th Cir. 2002). Under plain error review, we will reverse only where there was (1) an error, (2) that was clear and obvious, (3) that affected the defendant's substantial rights, and (4) that, if not corrected, would seriously affect the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 730-37 (1993).

#### 2. Analysis

Reagan alleges that the district court erred in denying his motion to sever Count 18—an honest services fraud charge against Lee, Hill, and Farrington— from the rest of the trial. While Lee, Hill, and Farrington were all convicted on Count 18, the district court granted each of them a judgment of acquittal after trial. The Government claims that Reagan never made a motion to sever, and Reagan does not indicate where in the record or when he made such a motion. As a result, we review his claim for plain error only.

Reagan cannot show that his substantial rights were affected by the district court's failure to sever this count from the remainder of the trial. The district court properly instructed the jury to consider each charge and each defendant separately and individually, and the jury did in fact acquit some of the defendants on various counts, including Reagan himself on one of the substantive extortion counts. We have previously held that the issuance of such instructions, which a jury is presumed to follow, militates against spillover

prejudice from a failure to sever.  *See United States v. Owens*, 683 F.3d 93, 99 (5th Cir. 2012).  We have also held that a jury's decision to acquit a defendant on some of the charges against him indicates that the defendant was not prejudiced by evidentiary spillover.  *See United States v. Arledge*, 553 F.3d 881, 896 (5th Cir. 2008).  Thus, to the extent that the district court erred in not severing the honest services fraud charge from the remainder of the trial, Reagan cannot show that his substantial rights were affected, and his claim is unavailing.

## I. Closing argument misconduct

### 1. Standard of review

"Counsel is accorded wide latitude during closing argument."  *United States v. Rodriguez*, 43 F.3d 117, 123 (5th Cir. 1995) (quoting *United States v. Willis*, 6 F.3d 257, 263 (5th Cir. 1993)).  Although a "prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence," *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008), "[r]eversal based on improper argument by the prosecutor is not called for when there has not been a strong showing of a deleterious effect upon the right to a fair trial."  *Rodriguez*, 43 F.3d at 124.  "The closing argument must be analyzed in the context of the entire trial to determine whether it affected substantial rights of the accused."  *Id.*  "When analyzing the impropriety of prosecutorial comments, the central issue for this court is 'whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'  This step 'sets a high bar.'"  *Rashad*, 687 F.3d at 643 (citation omitted) (quoting *United States v. Gracia*, 522 F.3d 597, 603 (5th Cir. 2008)).  When "there are no timely objections to statements made by the prosecution, this court reviews them for plain error."  *Id.* at 643.

### 2. Analysis

No. 10-10211

During the closing argument, the only objection made was to a comment made by the Government during its rebuttal that Hill and Farrington claim was improper bolstering of witnesses' credibility. The objection followed the Government's statement that Potashnik's wife Cheryl had been given a choice as to whether to plead guilty to Count 10, the bribery conspiracy count, or a different charge, a fact that was not in evidence. The appellants contend that this improperly bolstered the credibility of Government witnesses because it added the personal "imprimatur" of the prosecutor to the plea deals struck, including those entered into by Brian and Cheryl Potashnik, who testified against the appellants.

However, immediately after this statement and the appellants' resultant objection, the district court reminded the jury that "you're bound to the evidence that you have heard, and you will recall what it was." "[T]he district court can 'purge the taint of a prosecutor's prejudicial comments' with a cautionary instruction, even, in some cases, one that is 'merely generic.'" *United States v. Turner*, 674 F.3d 420, 439-440 (5th Cir. 2012) (quoting *United States v. McCann*, 613 F.3d 486, 496-97 (5th Cir. 2010)). In light of this instruction, we decline to hold that the prosecutor's objected-to statement "cast serious doubt on the correctness of the jury's verdict." *Rashad*, 687 F.3d at 643 (quoting *Gracia*, 522 F.3d at 603).

Additionally, for the first time on appeal, Hill and Farrington challenge numerous additional aspects of the Government's argument, including that it: (1) asked the jury to send a larger social message through their verdict and to strike a blow against government corruption; (2) appealed to wealth and class biases; (3) improperly focused on municipal layoffs; (4) improperly focused on Hill and Farrington's sexual relationship; (5) improperly expressed personal opinion and beliefs; (6) misled the jury by misstating the distinction between factual and legal conclusions; and (7) improperly referenced the defendants'

exercise of their right to a jury trial.  Because these were not raised before the district court, we review these claims for plain error only.  *Rashad*, 687 F.3d at 643.

We note at the outset that most of the specific statements that Hill and Farrington have identified in these arguments were comprised of restatements of "properly admitted evidence and . . . reasonable inferences or conclusions that can be drawn from that evidence," *Mendoza*, 522 F.3d at 491.  That the defendants disliked the facts that the Government chose to highlight, or the inferential gloss that the Government chose to put on those facts, cannot be a ground for reversal, in light of attorneys' "wide latitude" in crafting their closing arguments.  *Rodriguez*, 43 F.3d at 123 (quoting *Willis*, 6 F.3d at 263).

To the extent that the appellants validly challenge aspects of the Government's closing argument, we note that the district court issued several cautionary instructions to the jury that it was not to consider counsel's arguments as evidence.  Furthermore, the Government's case against the appellants was strong.  *See supra* Part A.  We have previously held that the curative effect of cautionary instructions and the strength of the Government's case are important facts in assessing the impact of a claim of prosecutorial misconduct. *See United States v. Fields*, 483 F.3d 313, 360 (5th Cir. 2007).  We fail to see the "deleterious effect upon the right to a fair trial," *Rodriguez*, 43 F.3d at 124, in this instance required to warrant reversal, and we decline to find plain error in the Government's closing argument as a result.

## J. Sentencing

### 1. Standard of review

We review a district court's sentencing decisions under a deferential abuse-of-discretion standard, first ensuring that the district court committed no significant procedural error before assessing the substantive reasonableness of the sentence imposed.  *See Gall v. United States*, 552 U.S. 38, 51 (2007).  We

review a district court's interpretation and application of the sentencing guidelines *de novo* and its findings of fact for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008) (citation omitted).

### 2. Loss calculation

Lee and Reagan both challenge the 18-point offense level increases imposed by the district court based on its finding that their offenses implicated a loss of more than $2.5 million. *See* U.S.S.G. §§ 2C1.1(b)(2); 2B1.1(b)(1)(J). The district court found this loss threshold met on the basis of Reagan's demand for $2.8 million from Fisher through the two proffered BSEAT contracts that Fisher rejected, which would have given BSEAT a 50% share in Fisher's developer's fees.

Lee and Reagan argue that the district court's finding was erroneous because the benefit BSEAT would have actually derived from the contracts is not ascertainable. As a result, they contend that the district court should have replaced its loss calculation with a determination of actual gain. *See* § 2C1.1(b)(2). Because Fisher never agreed to Reagan's more aggressive demands, this amount would have been far less than $2.5 million.

We reject the appellants' argument on this ground and hold that the district court's finding was not in error. The facts presented at sentencing showed that Reagan had demanded contracts valued at $2.8 million from Fisher and that the prospective value of those contracts was known to the conspirators. Section 2C1.1 allows loss calculation on the basis of "the value of anything obtained or to be obtained by a public official or others acting with a public official." It was not error for the district court to find that the value of "anything" that would have been obtained by the public officials and those acting with them as a result of the extortion conspiracy was in fact ascertainable and would have been the $2.8 million-value of the contracts that the appellants attempted to extort from Fisher.

No. 10-10211

### 3. *Supervisory role*

Lee challenges the district court's imposition of a further three-point increase in his offense level on the basis of his having been a manager or supervisor of criminal activity involving five or more participants. *See* U.S.S.G. § 3B1.1(b). Application note 4 to section 3B1.1(b) lists a number of factors that tend to support a finding of manager status, including the defendant's participation in planning, recruitment of accomplices, and exercise of control and authority over others. The facts presented at sentencing showed that Lee had planned and coordinated the structure of the conspiracy's takings from Potashnik, had recruited Spencer into the conspiracy, and had exercised control and authority over others on a number of occasions, including ordering the disbursement of funds from Farrington's account. We hold that the district court's finding that Lee was a manager or supervisor within the meaning of the Guidelines was not in error.

### 4. *Multiple acts*

Finally, Reagan challenges the district court's imposition of a two-point increase in his offense level pursuant to U.S.S.G. § 2C1.1(b)(1) for his conviction having involved more than one instance of extortion. Reagan contends that he engaged in only a single overarching act of extortion. In light of the fact that Reagan pushed Fisher into signing two separate contracts with him, attempted to get Fisher to sign the two $1.4 million contracts that Fisher rejected, attempted to get Fisher to hire his wife and parents, was involved in billing Fisher for RA-MILL's illusory work on the Pecan Grove development, and attempted to have Potashnik sign a contract with him as well, we hold that the district court had ample factual bases for determining that Reagan committed multiple instances of extortion.

### CONCLUSION

31

No. 10-10211

For the foregoing reasons, we AFFIRM the judgment of the district court in all respects.