# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-20671

United States Court of Appeals
Fifth Circuit

**FILED**
August 4, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

GAZELLE CRAIG, D.O.; SHANE FAITHFUL,

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CR-419-1
USDC No. 4:17-CR-419-2

Before BARKSDALE, HAYNES, and WILLETT, Circuit Judges.

PER CURIAM:*

Primarily at issue are Gazelle Craig's and Shane Faithful's challenges to: the sufficiency of the evidence supporting their jury-trial convictions for conspiring to unlawfully distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and aiding and abetting the unlawful distribution of controlled substances, or unlawfully distributing controlled substances

---

* Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 18-20671

having been aided or abetted by others, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1); and the district court's excusing a juror, rather than declaring a mistrial, after that juror had contact with a Government agent during the evening following the seventh day of a nine-day retrial. Appellants also claim additional trial and sentencing errors. Of the 11 issues appellants raise, nine of them, including sufficiency-of-the-evidence challenges, are reviewed only for plain error. The only two fully preserved issues are Craig's challenges to the procedural and substantive reasonableness of her sentence. AFFIRMED IN PART; VACATED and REMANDED IN PART.

I.

Appellants began operating the Gulfton Community Health Center (Gulfton) in Houston, Texas, as a pain-management clinic in 2015. Craig was Gulfton's medical director and sole treating physician; Faithful, its administrator and owner of its management company. They split the clinic's profits.

As stated in Faithful's opening brief on appeal:

The clinic's "formulary"—the "certain group of drugs" Dr. Craig consistently prescribed for treatment—consisted of "Norco," a mixture of the opioid hydrocodone and acetaminophen[,] . . . and "Soma," a brand of the drug carisoprodol marketed as a muscle relaxant. Both hydrocodone ([S]chedule II) and carisoprodol ([S]chedule IV) are federally controlled substances, meaning the only way to legally obtain them is through a prescription issued by a practitioner registered with the Drug Enforcement Agency (DEA).

The Texas State Medical Board began a formal investigation in September 2015 of Craig's practice at Gulfton based on allegations it was "an illegal pain clinic". As a result, the Board filed a complaint against Craig in August 2016 alleging, *inter alia*, she failed to prescribe controlled substances to patients in a manner consistent with public health and welfare.

2

No. 18-20671

In addition, the DEA investigated Gulfton for operating as a "pill mill": "a drug business exchanging controlled substances for cash under the guise of a doctor's office". *United States v. Oti*, 872 F.3d 678, 685 (5th Cir. 2017).

The Government's brief on appeal detailed Gulfton's business model as follows:

> Facilitators[, defined *infra*,] recruited putative patients off the streets, offering them cash—and sometimes breakfast and a beer—to go to Gulfton, pay the clinic fee [averaging, according to appellants' presentence investigation reports (PSR), $300 per visit] using the facilitator's money, fill out intake forms, undergo a *pro forma* medical exam, and obtain from Craig a prescription for a drug combination known as the "Vegas cocktail." That cocktail consisted of hydrocodone, an opioid listed as a Schedule II controlled substance because of its potential for abuse; and carisoprodol, a muscle relaxant listed on Schedule IV that increases the euphoric high of the opioid. Once patients had the prescriptions, the facilitator took the patient to a pharmacy to have the prescription filled, after which the patient would hand the unopened bottles of pills to the facilitator in exchange for cash.

The facilitators, also known as "crew leaders", were drug dealers who accounted for at least 75 percent of the clinic's business.

As part of this business model, Gulfton required advance cash payments; it did not accept credit-card payments or insurance coverage. In that regard, Faithful: determined the prescriptions' prices; required patients, rather than facilitators, pay for the prescriptions; and prohibited patients and facilitators from exchanging money inside the clinic. Faithful also: prohibited from the clinic cell phones, other electronic devices, and bags; and required physician assistants to pat down patients to ensure they were not carrying an item that could record Gulfton's operations.

If a patient violated Gulfton's policies, Craig denied that patient a prescription or prescribed a lower number of pills. When that occurred, facilitators could substitute another individual for the patient denied a

3

No. 18-20671

prescription or receive a Gulfton business card that served as a clinic credit. Each credit, approved by Craig or Faithful, allowed a facilitator to bring another patient to the clinic without paying in full for his prescription. To help anticipate the number of patients to be seen each day, the clinic's appointment book detailed the names of the facilitators, and their expected number of patients, arriving the following day.

According to DEA analysis of records kept by the Texas State Board of Pharmacy, from 1 March 2015 to 15 June 2017 Craig issued 18,253 prescriptions for hydrocodone and 15,649 prescriptions for carisoprodol. Moreover, those 33,902 prescriptions accounted for 98.6 percent of all prescriptions she wrote during that time.

Gulfton's last day of operations was 7 July 2017. The clinic saw 66 patients that day, to whom Dr. Craig prescribed 7,460 hydrocodone pills and 5,565 carisoprodol pills. Prescriptions for those 13,025 pills netted both appellants single-day cash earnings of $5,720.

On 10 July, DEA and local agents executed a search warrant at the clinic and search and arrest warrants at appellants' residences, arresting both Craig and Faithful. At Faithful's residence, agents found, *inter alia*, an appointment card given as clinic credit and over $141,000 cash in envelopes labeled "Shane" and "Doc". At Craig's residence, agents found, *inter alia*, over $39,000 cash in envelopes labeled "Doc" or "Dr. Craig". At Gulfton, agents found, *inter alia*, over $15,500 cash, also in labeled envelopes, and x-ray and magnetic resonance imaging requests, presigned by Dr. Craig, designating chronic lower back pain as a patient's ailment but leaving blank the information about the patient, including his name.

Both Craig and Faithful were indicted on four counts: conspiring to unlawfully distribute and dispense controlled substances "not with a legitimate medical purpose and outside the scope of professional practice", in

4

No. 18-20671

violation of 21 U.S.C. §§ 841(a)(1) and 846 (count one); and aiding and abetting the unlawful distribution and dispensation of controlled substances, or unlawfully distributing and dispensing controlled substances having been aided or abetted by others, "not for a legitimate medical purpose and outside the scope of professional practice", in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a) (counts two through four). The indictment also included a notice of criminal forfeiture, pursuant to 21 U.S.C. § 853(a), allowing for the possibility of the court's entering a personal money judgment against each appellant.

A first trial began in January 2018. The court granted appellants' motions for a mistrial after the jury failed to reach a unanimous verdict on any count for either appellant.

The nine-day retrial occurred in March 2018. On the morning of the eighth day of the retrial, a juror reported to the case manager that she had contact with a Government agent the prior evening. After conducting an inquiry, including receiving testimony from the agent and the juror and receiving the parties' positions regarding how to proceed, the court excused the juror.

Following deliberations, the jury returned guilty verdicts on all four counts for both Craig and Faithful. The court later sentenced both to, *inter alia*, 420-months' imprisonment. It also entered personal money judgments against them, first against Faithful ($3,332,000) and then against Craig ($2,940,000).

II.

Both appellants primarily challenge: the sufficiency of the evidence supporting their jury-trial convictions; and the court's excusing a juror, rather than declaring a mistrial, after that juror had contact with a Government agent during the evening following the seventh of nine days of trial. These

5

No. 18-20671

were the only challenges presented at oral argument before our court, and both fail.

Appellants also claim a number of additional trial and sentencing errors, discussed *infra.* Other than Faithful's challenge to the amount of his personal money judgment, which the Government concedes was in error, these claims also fail.

As noted, of the 11 issues before our court, appellants did not preserve nine of them, including their sufficiency-of-the-evidence challenges, in district court. Those nine issues, therefore, are reviewed only for plain error. (But, even if the nine issues reviewed for plain error were reviewed under their usual, less-demanding standards of review, the result would be the same.)

## A.

Craig and Faithful both challenge the sufficiency of the evidence. As stated, each challenge fails.

### 1.

For those challenges, Craig and Faithful both assert: the statutory definitions of "dispense" and "distribute" under the Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, are mutually exclusive, meaning a doctor cannot "distribute" a controlled substance through a prescription; the Government elected for trial to narrow all four counts to unlawful distribution, removing the dispensation theory of liability from the jury's consideration; and, as a result, the Government's presenting evidence—according to appellants—only as to dispensation of, and a conspiracy to dispense, controlled substances was insufficient to support their convictions.

Although Craig and Faithful each present a sufficiency challenge in their opening briefs on appeal, Craig's reply brief "adopts the briefing set out on th[e] [sufficiency] issue in the Reply Brief filed . . . by [Faithful]", pursuant to Federal Rule of Appellate Procedure 28(i) ("In a case involving more than one

No. 18-20671

appellant or appellee, including consolidated cases, any number of appellants or appellees may join in a brief, and any party may adopt by reference a part of another's brief. Parties may also join in reply briefs."). For obvious reasons, our court, however, "has held that an appellant may not adopt by reference fact-specific challenges to his conviction", including "challenges to the sufficiency of the evidence". *United States v. Morgan*, 117 F.3d 849, 853 (5th Cir. 1997) (citations omitted). But, because Craig fully articulates her sufficiency challenge in her opening brief, we need not address further her arguably improper adoption of the sufficiency issue as briefed in Faithful's reply.

a.

Preserved sufficiency challenges are reviewed *de novo*. *Oti*, 872 F.3d at 686 (citation omitted). Such review "is highly deferential to the verdict" and "consider[s] the evidence in the light most favorable to the [G]overnment, with all reasonable inferences and credibility determinations made in [its] favor". *Id.* (internal quotation marks and citations omitted). In that regard, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt". *Id.* (emphasis in original) (citation omitted). Moreover, "it [is] within the sole province of the jury as the fact finder to decide the credibility of the witnesses and to choose among reasonable constructions of evidence"; accordingly, "[w]e will not second guess the jury in its choice of which witnesses to believe". *E.g.*, *United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994) (citations omitted).

At the close of the Government's case-in-chief, both appellants moved for judgment of acquittal based on insufficient evidence, pursuant to Federal Rule of Criminal Procedure 29(a) (permitting judgment-of-acquittal motions after close of Government evidence and close of all evidence). In doing so, Faithful

No. 18-20671

asserted the Government failed to prove a conspiracy; Craig similarly asserted such failure and also contended the Government "ha[d] not met [its] burden" regarding the substantive counts.  The motions were denied.

Craig then presented evidence, including by electing to testify.  Faithful introduced a set of text messages into evidence but did not call any witnesses.

"To preserve *de novo* review [of a Rule 29(a) motion for judgment of acquittal], however, a defendant must specify at trial the particular basis on which acquittal is sought so that the Government and district court are provided notice." *United States v. McDowell*, 498 F.3d 308, 312–13 (5th Cir. 2007) (citations omitted).  Moreover, "[w]hen the defendant moves for judgment of acquittal at the close of the [G]overnment's case in chief, and defense evidence is thereafter presented but the defendant fails to renew the motion at the conclusion of all the evidence, he waives objection to the denial of his earlier motion". *United States v. McIntosh*, 280 F.3d 479, 483 (5th Cir. 2002) (citations omitted).

Importantly, appellants' Rule 29(a) motions did not identify the following basis for acquittal they now assert on appeal:  the Government asked the jury to return a verdict only as to distribution but its evidence related only to dispensation. *See McDowell*, 498 F.3d at 312–13 (citations omitted). Moreover, appellants (as they concede) did not renew their Rule 29(a) motions after the close of all evidence.  Accordingly, they forfeited any objection to the denial of their prior motions. *See McIntosh*, 280 F.3d at 483 (citations omitted).

Instead, appellants jointly moved post-verdict for a new trial, pursuant to Rule 33(a) (permitting defendant motions for new trial), which the court denied.  They claim on appeal this joint Rule 33 motion *for a new trial*, filed after the jury rendered its verdict and was discharged by the court, preserved their sufficiency challenges by satisfying Rule 29(c) (permitting *judgment-of-acquittal* motions after a jury verdict or jury discharge and stating "defendant

No. 18-20671

is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge"). We need not decide whether a proper Rule 29(c) motion could have preserved appellants' sufficiency challenges, however, because appellants' threshold contention that their Rule 33 *new-trial* motion serves as a Rule 29(c) *judgment-of-acquittal* motion in this instance lacks merit.

In support of this contention, appellants cite, *inter alia*: their Rule 33 motion, which states "the Government failed to prove each and every element of the" charged offenses; *United States v. Bell*, 623 F.2d 1132, 1134 n.2 (5th Cir. 1980); and *United States v. Mann*, 557 F.2d 1211, 1216 n.6 (5th Cir. 1977). In *Bell*, "[a]ppellant filed a motion for a new trial, listing among the grounds therefor the court's failure to grant his earlier motions for judgment of acquittal", and our court noted that, "[b]y so doing, appellant preserved his objection to the court's prior rulings". *Bell*, 623 F.2d at 1134 n.2 (citation omitted). And, according to *Mann*, "nothing in Rule 29(c) or in our decisions prohibits a motion for acquittal, capable of preserving the sufficiency question for appeal, from being embodied in a motion for a new trial". *Mann*, 557 F.2d at 1216 n.6.

As stated, however, appellants' contention is unavailing. First, the language they cite from their Rule 33 motion is from the motion's first sentence, describing their prior Rule 29(a) motions, and does not otherwise articulate a basis for their Rule 33 motion: "Co-Defendants *urged* a Joint Rule 29 Motion for Judgment of Acquittal . . . based on the fact that the Government failed to prove each and every element of the [charged offenses] beyond a reasonable doubt. . . . *[N]ow* Co-Defendants file this Rule 33 Motion for New Trial". (Emphasis added.)

Second, appellants' Rule 33 motion never listed the court's denying their Rule 29(a) motions *as a ground* for their Rule 33 motion. *See Bell*, 623 F.2d at

1134 n.2 (citation omitted).  The Rule 33 motion does state:  "[t]he weight of the evidence in this case is clearly against the verdict as the Government failed to prove each element of every count beyond a reasonable doubt"; and appellants "specifically incorporate the same insufficiency of the evidence arguments made in their Rule 29 Motion".  These statements, however, are in the context of appellants' *distinguishing* Rule 33 from Rule 29 by, *inter alia*: asserting "[o]ne basis for granting a new trial under Rule 33 is that the jury's verdict was based upon insufficient evidence"; and urging the court to grant a new trial under Rule 33's "much broader standard of review" than that for Rule 29.

Finally, appellants' Rule 33 motion for a new trial does not otherwise "embod[y]" a Rule 29(c) motion for a judgment of acquittal.  *See Mann*, 557 F.2d at 1216 n.6.  The motion is styled as a Rule 33 motion and, as referenced in part, goes to great lengths to distinguish a Rule 29 motion.  In that regard, the motion states, *inter alia*:  Rule 33 motions "involve[] a much broader standard of review" than Rule 29 motions; "[i]t is significant that a Rule 29 motion for judgment of acquittal and Rule 33 motion for a new trial based on the weight of the evidence are governed by very different standards"; "in contrast to Rule 29[—]under which a trial court must view the evidence in [the] fashion most favorable to the Government[—]Rule 33 places no such restriction"; and "[e]ven if . . . a judgment of acquittal is not appropriate in this case, [the court] may still grant a new trial based on the fact . . . that the Government failed to prove an essential element of [the] crime charged beyond a reasonable doubt".

Consequently, because appellants did not preserve their sufficiency challenges in district court, those challenges are reviewed only for plain error.  *E.g.*, *United States v. Huntsberry*, 956 F.3d 270, 282 (5th Cir. 2020) (citation omitted).  Under the plain-error standard, appellants must show a forfeited plain error (clear or obvious error, rather than one subject to reasonable

No. 18-20671

dispute) that affected their substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009) (citations omitted). If they make that showing, the court has the discretion to correct such reversible plain error but generally should do so only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings". *Id.* (citation omitted).

"In the sufficiency of the evidence context, [our] court . . . reverse[s] under plain[-]error review only if there is a 'manifest miscarriage of justice,' which occurs only where 'the record is devoid of evidence pointing to guilt' or the evidence is so tenuous that a conviction is 'shocking.'" *Oti*, 872 F.3d at 686 (quoting *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) (en banc)). Appellants have not shown the requisite "manifest miscarriage of justice". *See id.* (citation omitted). (Nor, as noted, would appellants' sufficiency challenges succeed even if properly preserved and reviewed *de novo*.)

b.

The CSA states "it shall be unlawful for any person knowingly or intentionally . . . (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance". 21 U.S.C. § 841(a)(1). In that regard, "'dispense' means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance". *Id.* § 802(10). On the other hand, "'distribute' means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical". *Id.* § 802(11).

As stated, appellants assert: these definitions of dispense and distribute are mutually exclusive; and, consequently, they could not be convicted of *distributing*, and conspiring to *distribute*, controlled substances through Craig's *prescriptions*, which fall under the definition of *dispense*. For support, appellants rely primarily on *United States v. Leigh*, 487 F.2d 206 (5th Cir.

1973), which they contend was reaffirmed by *United States v. Armstrong*, 550 F.3d 382 (5th Cir. 2008), *overruled on other grounds*, *United States v. Balleza*, 613 F.3d 432, 433 n.1 (5th Cir. 2010) (per curiam).

Appellants are correct that the Government voluntarily asked that the jury return verdicts only for distributing, and conspiracy to distribute, controlled substances despite dispensing, and conspiracy to dispense, controlled substances being alternatives in the indictment. In that regard, and as detailed in Faithful's opening brief on appeal:

> In the morning on the sixth day of [the first] trial, the [G]overnment filed its proposed jury [instructions]. As to each count, the [G]overnment limited the charged *actus reus* to "distributing," eliminating the dispensing alternative from the indictment. The [G]overnment proffered special verdict forms narrowed in the same way. The defense did not object to the limitations, and the district court accepted and incorporated them into the final charge and verdict forms submitted to the jury.

The court used those same, narrowed jury instructions and verdict forms at the retrial. Although the Government contends the jury instructions do not limit our evaluation of the sufficiency of the evidence, we need not reach that contention because we conclude that *Leigh* and *Armstrong* do not mandate the outcome appellants seek.

In *Leigh*, our court held "a doctor can be indicted, tried, and convicted for the unlawful dispensing of a controlled substance, if his prescription is not for a legitimate medical purpose in the usual course of his professional practice". *Leigh*, 487 F.2d at 207 (citation omitted). The court then affirmed dismissal of a doctor's indictment charging *unlawful distribution* for "fail[ing] to charge an offense within the terms of the applicable statutes". *Id.* at 207–08.

Thereafter, in *Armstrong*, our court referenced *Leigh*'s conclusion, noting:

> The logical reading of the statutory definitions of "dispense" and "distribute" that led this [c]ourt in [*Leigh*] to determine a doctor writing illegal prescriptions must be charged with dispensing rather than distributing[] counsels that a non-registrant who does not write prescriptions but otherwise acts to provide drugs would not properly be charged with dispensing rather than distributing.

*Armstrong*, 550 F.3d at 393 (citation omitted). The *Armstrong* decision further stated *Leigh*'s holding was reaffirmed by *United States v. Harrison*, 628 F.2d 929 (5th Cir. Unit B 1980) (*Harrison I*), *reh'g granted*, 651 F.2d 353 (5th Cir. Unit B July 1981). *Id.* (All cases from Unit B, which became the eleventh circuit on 1 October 1981, are precedent in our circuit. *E.g.*, *United States v. Rojas-Martinez*, 968 F.2d 415, 420 n.11 (5th Cir. 1992).) The *Harrison I* decision, in dismissing an indictment, stated: "Precedent in this circuit establishes that, under Title 21 of the Code, a doctor who administers or prescribes a controlled substance in an unlawful manner is to be indicted for dispensing it rather than distributing it. *U. S. v. Leigh*". *Harrison I*, 628 F.2d at 930 (italics added) (citation omitted).

Critically, however, and unreferenced by the *Armstrong* opinion, the *Harrison I* panel revisited its conclusion upon petition for rehearing (*Harrison II*), where it instead distinguished *Leigh*, noting that the indictment in *Leigh* charged only that a doctor "did knowingly and intentionally distribute . . . a controlled substance in violation of [§] 841(a)(1)". *Harrison II*, 651 F.2d at 354 (citation omitted). It then held the indictment at issue in *Harrison* distinguishable from that in *Leigh* because the one in *Harrison* "charged distribution that was [both] 'unlawful' *and* 'for other than a legitimate medical purpose and not in the usual course of medical practice'", thereby "stat[ing] an

13

offense" under 21 U.S.C. § 841(a)(1) (criminalizing, *inter alia*, distribution or dispensation of controlled substance). *Id.* (emphasis added).

Later cases in our court support this distinction and have upheld doctors' convictions "for distributing a controlled substance under 21 U.S.C. § 841" when the Government proves: "(1) that [the doctor] distributed *or* dispensed a controlled substance, (2) that [the doctor] acted knowingly and intentionally, and (3) that [the doctor] did so *other than for a legitimate medical purpose and in the usual course of [the doctor's] professional practice*". *E.g.*, *United States v. Evans*, 892 F.3d 692, 703 (5th Cir. 2018) (emphasis added) (internal quotation marks and citation omitted); *Oti*, 872 F.3d at 687 n.3 (citations omitted) ("Because [appellants] are all medical professionals and generally authorized to prescribe controlled substances, the [G]overnment also had to prove beyond a reasonable doubt that the distribution was other than in the course of professional practice and for a legitimate medical purpose." (citation omitted)); *see also United States v. Bennett*, 874 F.3d 236, 241, 244 (5th Cir. 2017) (registered nurse); *United States v. Brown*, 553 F.3d 768, 773, 780–81 (5th Cir. 2008) (citation omitted) (pharmacists); *United States v. Norris*, 780 F.2d 1207, 1208–09 (5th Cir. 1986) (citation omitted) (doctor). Notably, "[a]lthough the [above-stated] third element is not expressly required by § 841", it follows from "pertinent regulations provid[ing] that a controlled substance can be dispensed by a prescription 'issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice'". *Norris*, 780 F.2d at 1209 (quoting 21 C.F.R. § 1306.04(a) (1985)). Similarly, the present iteration of § 1306.04(a) states: a controlled-substance prescription is "effective" only if "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice"; and "a [purported] prescription issued not in the usual

No. 18-20671

course of professional treatment or in legitimate and authorized research is not a prescription".  21 C.F.R. § 1306.04(a) (2005).

*Armstrong* did not disrupt this distinction.  First, and as stated, it referenced only *Harrison I* and not *Harrison II.  See Armstrong*, 550 F.3d at 393.  Second, it involved an individual, who was "*not* a physician registered under the CSA", indicted on 26 substantive counts of "illegally *dispens[ing]* controlled substances outside the scope of professional practice", and aiding and abetting that conduct, pursuant to 18 U.S.C. § 2 and 21 U.S.C. § 841(a). *Id.* at 392–93 (emphasis added).  Therefore, although the court did "reject the Government's assertion that [appellant] may be convicted as a principal under § 841", based on the relevant statutory definitions and because *Leigh*'s "determin[ing] a doctor writing illegal prescriptions must be charged with dispensing rather than distributing[] counsel[ed] that a non-registrant who does not write prescriptions but otherwise acts to provide drugs would not properly be charged with dispensing rather than distributing", it did so under distinguishable factual circumstances and when answering a different question than that controlled by *Harrison II.  See id.* (citation omitted). Finally, *Armstrong* itself made clear that, in affirming the jury instructions used by the district court, "a practitioner is unauthorized to dispense a controlled substance if the prescription *either* lacks a legitimate medical purpose *or* is outside the usual course of professional practice".  *Id.* at 397 (citing, *inter alia*, 21 C.F.R. § 1306.04).  "In other words, knowingly distributing prescriptions outside the course of professional practice is a sufficient condition to convict a defendant under the criminal statutes relating to controlled substances." *Id.*

The indictment charged Craig and Faithful with a conspiracy "to knowingly, intentionally, and unlawfully distribute and dispense . . . controlled substances . . . *not with a legitimate medical purpose and outside the scope of*

15

*professional practice*". (Emphasis added.) Moreover, the indictment identified "the purpose and object of the conspiracy" as, *inter alia*, "prescribing controlled substances *without a legitimate medical purpose and outside the scope of professional practice*". (Emphasis added.) Similarly, the indictment charged appellants with three substantive counts of "unlawfully distribut[ing] and dispens[ing], *not for a legitimate medical purpose and outside the scope of professional practice*, . . . controlled substances". (Emphasis added.)

The jury instructions, as narrowed by the Government, provided that, to convict on count one (conspiracy), the jury "must be convinced that the [G]overnment has proven . . . beyond a reasonable doubt", *inter alia*, "[t]hat two or more persons, directly or indirectly, reached an agreement to unlawfully distribute a controlled substance *not for a legitimate medical purpose or not in the usual course of professional practice*". (Emphasis added.) And, on counts two through four, the jury was similarly instructed it "must be convinced that the [G]overnment has proved . . . beyond a reasonable doubt", *inter alia*, "[t]hat the defendant distributed a controlled substance . . . *other than for a legitimate medical purpose or in the usual course of professional practice*". (Emphasis added.)

Consequently, distribution (and conspiracy to distribute) was not an improper charge here, because the evidence demonstrated, as alleged by the Government, that Craig's prescriptions were issued outside the usual course of professional practice and not for a legitimate medical purpose. Craig and Faithful, therefore, have not shown the requisite plain (clear or obvious) error regarding the sufficiency of the evidence proffered to obtain their convictions, and their sufficiency challenges fail.

16

No. 18-20671

B.

A number of trial errors are also claimed, including appellants' primary contention that the court erred by excusing a juror, rather than declaring a mistrial, after that juror had contact with a Government agent during the evening following the seventh day of the nine-day retrial. Again, each challenge fails.

1.

As for the court's excusing a juror, it informed the parties on the day closing arguments were to begin that a juror had reported having an encounter the prior evening with a Government agent attending trial (a DEA agent who had participated in surveillance of Gulfton and was observing the trial; he was not a witness). In summarizing what had been reported, the court stated, *inter alia*: the agent entered the same elevator as the juror; "tried to engage in just some sort of chitchat"; and "kind of followed the juror out of the courthouse". The court then took testimony from both the agent and the juror.

The agent testified, *inter alia*, he: knew the woman was on the jury; was in the elevator with her; made a comment to her while they were in the elevator about how long the day had been; and ended up walking out of the courthouse around 20 feet behind her after retrieving his firearm before leaving the building. The juror, noting she had been the last juror to leave the courthouse after stopping to use the restroom, testified, *inter alia*: she knew the man was a Government agent; the encounter made her "uncomfortable"; she did not tell any of the other jurors about what happened; and she knew the incident would not affect or influence her.

Faithful moved for a mistrial, which the Government opposed. Craig, however, explicitly elected not to move for a mistrial. The court denied Faithful's motion but excused the juror, basing its decision "upon the statements of the Government and both defense counsel, specifically, the

17

concerns raised by [Faithful's lawyer] as to this one juror". (That court's practice is to keep 14 jurors until the case is submitted to the jury, when two names are drawn at random to serve as alternates. Dismissing the juror before the case was submitted to the jury left the court with 13 jurors, from which one would be randomly chosen as the alternate.) Both appellants challenge the court's decision not to declare a mistrial, even though Craig expressly declined to so move at trial.

Faithful contends: the court erred because, after it found there was improper outside influence on the juror, the proper remedy, pursuant to *Remmer v. United States*, 350 U.S. 377 (1956), was to declare a mistrial rather than excuse the juror; and the juror's excusal prejudiced Faithful because the excused juror was one of only two black persons among the 14 potential jurors, thereby "materially alter[ing] the racial composition of the jurors available to ultimately decide the case". (Both Craig and Faithful are black.)

Craig contends: the proper remedy for an improper-outside-influence finding, pursuant to *Remmer*, was declaring a mistrial; the court should have determined a racially-based strike occurred, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), due to the agent's conduct; the juror's race-based exclusion violated the juror's equal-protection right to jury service; and the juror's excusal prejudiced Craig by possibly altering the composition of the selected 12-member jury.

a.

"We review only for abuse of discretion a [preserved objection to a] court's handling of complaints of outside influence on the jury." *United States v. Smith*, 354 F.3d 390, 394 (5th Cir. 2003) (citation omitted). "In granting a broad discretion to the trial judge, we acknowledge and underscore the obvious, that the trial judge is in the best position to evaluate accurately the potential impact of the complained-of outside influence." *Id.* (citation omitted).

18

No. 18-20671

Moreover, "[o]ur precedents allow the trial judge the flexibility, within broadly defined parameters, to handle such situations in the least disruptive manner possible". *United States v. Ramos*, 71 F.3d 1150, 1153 (5th Cir. 1995). Again, however, an unpreserved challenge is reviewed only for plain error. *E.g.*, *Delgado*, 672 F.3d at 328–30.

As noted in part, Craig (as she concedes) explicitly declined to move for a mistrial in district court by stating, after Faithful moved for a mistrial and the court asked whether Craig also so moved: "My position is Defendant Craig does not move for a mistrial". But, in contending before our court that her challenges were preserved, Craig claims: Faithful's passing reference to *Batson* at trial was sufficient to preserve the issue for appeal; and, in any event, Faithful's motion for a mistrial preserved her contentions because the court had previously granted her 21 December 2017 motion "to incorporate and adopt each and every motion filed by all co-defendants . . . during the course of the prosecution of this cause".

That said, even assuming Craig could rely on Faithful's mistrial motion to preserve her contentions on appeal based on a months-prior court order, and notwithstanding having explicitly disclaimed any intention to so move during the retrial, Faithful's mistrial motion stated only:

> Given the fact that this juror is of American -- is an African-American juror, okay, and the fact that there are only two on this panel, okay, it -- I look at it as being a possible attempt to -- to alter the jury panel or intimidate people where she won't be there[.]  . . .
>
> [B]eing there are 14 jurors here who are in play and there are only two African-Americans, if she's intimidated enough to the point where she's off, then it imbalances the effect of how the jury -- what the actual jury would actually hear in this particular case, Judge; and that's my particular concern. And because of that, I'd move for a mistrial.

19

No. 18-20671

Consequently, only Faithful's assertion the juror's excusal materially changed the jury's composition (and Craig's similar assertion on appeal, to the extent she could rely on Faithful's mistrial motion) was preserved for appeal. In any event, and as stated *supra*, all of appellants' contentions on this issue fail whether reviewed for plain error or abuse of discretion.

b.

This is because the court did not make a finding of improper outside influence. Rather, as noted, it stated: "Based upon the statements of the Government and both defense counsel, specifically, the concerns raised by [Faithful's lawyer] as to this one juror, this one juror is excused". This statement does not show the court made any specific finding. Instead, it reflects: the court's stated "concern" at trial regarding "one of the [d]efendants moving for a mistrial and the other one not moving for a mistrial"; and its utilizing its broad discretion to consider the circumstances, and the three parties' positions, before making an informed decision on how to proceed.

And, even if the court had made an improper-outside-influence finding, *Remmer* would not have required a mistrial. *Remmer* involved a juror who: was bribed at his home during trial; stated he "ha[d] been under a terrific pressure"; and became "a disturbed and troubled man from the date of the . . . contact until after the trial". *Remmer*, 350 U.S. at 378, 380–81. The juror still, however, "sat on the jury for the remainder of the long trial and . . . cast [a] ballot". *Id.* at 381–82. The Supreme Court held, under these circumstances, a new trial was warranted "on a consideration of all the evidence". *Id.* at 382.

*Remmer* is, therefore, distinguishable on its facts: it involved a completed trial and a heavily affected juror, *see id.* at 381–82, whereas the incident at hand occurred before closing arguments and the juror at issue stated it would not influence her. Moreover, the Court in *Remmer* considered "all the evidence" rather than automatically requiring a mistrial, *see id.* at 382,

and the court here similarly evaluated the circumstances before making a decision within its discretion.

Additionally, *Batson* is inapposite.  It held, in a case involving "*the prosecutor's* removal of all black persons on the venire", that "the Equal Protection Clause forbids *the prosecutor* [from] challeng[ing] *potential* jurors *solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the [Government's] case against a black defendant*".  *Batson*, 476 U.S. at 89, 100 (emphasis added).  It does not apply where, as here, the court *sua sponte* invokes its discretion to excuse a juror during trial based on possible outside influence.  Moreover, even if *Batson* applied, there is no evidence the juror was excused by the court—or, as Craig asserts, was targeted for excusal by the DEA agent—"solely on account of [her] race or on the assumption that [she would] be unable impartially to consider the [Government's] case".  *See id.* at 89.  (This is true even assuming, as Craig contends, the trial's jury-selection phase was ongoing until the 12-member jury was selected upon the case's submission to the jury.)

Finally, it is true a potential juror's equal-protection right is violated when excluded from jury-service based on her race.  *Georgia v. McCollum*, 505 U.S. 42, 48–49 (1992) (citations omitted).  But, as stated, nothing in the record even suggests the court excused the juror, or that the DEA agent targeted the juror for excusal, due to her race.  Rather, as the Government's brief on appeal noted, the record reflects the court excused the juror "because she experienced and reported an outside contact that other jurors did not".  And, in the light of the court's impartial method of reducing the pool of 14 jurors to 12 upon the case's submission to the jury, it goes without saying that the selected 12-member jury might have been the same even if the juror had never been excused.

No. 18-20671

2.

Faithful contends "the prosecutor repeatedly assumed and vigorously argued facts not established by the evidence during . . . closing argument", including by stating Craig and Faithful were responsible for, and knew about, millions of opioids ending up on Houston's streets. According to Faithful, these remarks warrant reversal of his convictions because:  they "were highly prejudicial"; their "impact was not dampened by a specific limiting instruction"; and the evidence of Faithful's guilt "was not overwhelming".  Again, this contention fails.

a.

"Counsel is accorded wide latitude during closing argument." *United States v. Reagan*, 725 F.3d 471, 492 (5th Cir. 2013) (citation omitted).  In that regard, "[r]eversal based on improper argument by the prosecutor is not called for when there has not been a strong showing of a deleterious effect upon the right to a fair trial".  *Id.* (alteration in original) (citation omitted).

"In reviewing claims of improper prosecutorial arguments, we first analyze whether the prosecutor's remark was legally improper." *United States v. Phea*, 755 F.3d 255, 266–67 (5th Cir. 2014) (alteration, internal quotation marks, and citation omitted).  "In closing argument, a prosecutor is limited to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence . . . [and] is not permitted to make an appeal to passion or prejudice calculated to inflame the jury." *Id.* at 267 (alterations in original) (internal quotation marks and citation omitted).  But, importantly, "a prosecutor may appeal to the jury to act as the conscience of the community[,] so long as the comments are not calculated to inflame".  *United States v. Duffaut*, 314 F.3d 203, 211 (5th Cir. 2002) (alteration in original) (internal quotation marks and citation omitted).

No. 18-20671

A prosecutor's legally "[i]mproper argument warrants reversal when[,] taken as a whole in the context of the entire case, [it] prejudicially affect[ed] substantial rights of the defendant". *Phea*, 755 F.3d at 267 (first alteration added) (internal quotation marks and citation omitted). "To make that determination, we assess (1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt." *Id.* (citation omitted).

Faithful (as he concedes) did not object to the prosecutor's remarks in district court, however. Therefore, review is again only for plain error, *e.g.*, *Delgado*, 672 F.3d at 328–30, and he has not shown the requisite clear or obvious error. (And, as noted, Faithful's challenge would fail even if reviewed under a less-demanding standard of review.)

b.

Like the comments in *Duffaut*, "regarding drug distribution affecting 'family after family' and 'person after person'", the challenged comments here "were relatively benign". *See Duffaut*, 314 F.3d at 211. This is particularly true because, "[w]hen analyzing the impropriety of prosecutorial comments, the central issue . . . is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict", which is "a high bar". *Reagan*, 725 F.3d at 492 (internal quotation marks and citation omitted). No such doubt was cast on the verdict in this instance, as Faithful's "dislik[ing] the facts that the Government chose to highlight, or the inferential gloss that the Government chose to put on those facts, cannot be a ground for reversal, in [the] light of attorneys' 'wide latitude' in crafting their closing arguments". *Id.* at 493 (citation omitted).

Further, even if the prosecutor's comments were considered legally improper, the "court can purge the taint of a prosecutor's prejudicial comments with a cautionary instruction, even, in some cases, one that is merely generic".

*Id.* (internal quotation marks and citation omitted).    Along that line, in instructing the jury in this instance, the court made clear the jury "must consider only the evidence presented during the trial", and "[t]he questions, statements, objections, and arguments made by the lawyers are not evidence".

3.

Faithful also invokes the cumulative-error doctrine to assert his convictions should be reversed based on "the cumulative prejudicial impact of the [G]overnment's misconduct", even if his juror-excusal and improper-comments contentions fail individually.    Again, because Faithful did not object on this basis in district court, our review is only for plain error.    *E.g.*, *Delgado*, 672 F.3d at 328–30.    In any event, the cumulative-error doctrine is inapposite.

"The cumulative error doctrine provides that an aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal."    *United States v. Eghobor*, 812 F.3d 352, 361 (5th Cir. 2015) (italics added) (internal quotation marks and citation omitted).    "The doctrine justifies reversal only in the unusual case in which synergistic or repetitive error violates the defendant's constitutional right to a fair trial."    *Id.* (citation omitted).    "In applying th[e] doctrine, a court must determine whether the errors so fatally infect[ed] the trial that they violated the trial's fundamental fairness."    *United States v. Ebron*, 683 F.3d 105, 130 (5th Cir. 2012) (internal quotation marks and citation omitted).

Obviously, the doctrine is inapplicable where, as here, there are no errors to aggregate.    *See Eghobor*, 812 F.3d at 361 ("The cumulative error doctrine does not apply here because the district court did not err and, as such, there are no errors that we could aggregate to find cumulative error."); *Ebron*, 683 F.3d at 130 ("In this case, the cumulative error doctrine does not apply for one simple reason:  there is nothing to cumulate.").

No. 18-20671

4.

Craig claims error in the Government's stating, during its closing argument, that she "broke the law" by "[p]racticing below the standard of care". According to Craig, this contravened the principle, from *United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980), that violation of a civil regulation cannot be used to lower the required standard of proof for showing criminal intent. She asserts this is particularly true here because the court had previously sustained her objection, and instructed the jury to disregard specific testimony, regarding the Texas Medical Board's complaint.

In that regard, Craig moved during trial for a mistrial because the Government "published to the jury evidence that the jury should not have seen in the form of the [Texas Medical Board's] complaint". The district court denied her motion. She never similarly objected, however, that she was convicted under a civil-law standard of proof, which is her contention on appeal. Our review of this issue, therefore, is again only for plain error, *e.g.*, *Delgado*, 672 F.3d at 328–30, and the requisite clear or obvious error is lacking. (Again, Craig's contention would fail even if preserved in district court.)

At issue is a portion of the Government's closing argument:

> Dr. Craig, of course, was allowed to write the prescriptions as a medical doctor; but she broke the law because her prescriptions were not for a legitimate medical purpose. And they were outside the scope of professional practice. She broke the law because her prescriptions were given to drug dealers to sell on the street. There is no legitimate medical purpose for that.
>
> She broke the law when she wrote prescriptions without evaluating patients with a disregard for patients' medical history and with a disregard for patients' needs and the risks. She broke the law when she wrote the same prescriptions for the same drugs in the same amount day after day after day for two and a half years. Dr. Craig broke the law when she wrote the same prescription for Norco and Soma to everyone. *Practicing below the standard of care*.

25

No. 18-20671

(Emphasis added.)

As discussed *supra*, to prove Craig violated the CSA, the Government was required to show beyond a reasonable doubt that she, *inter alia*, "knowingly and intentionally acted outside the course of professional practice and without a legitimate medical purpose". *E.g.*, *United States v. Chube II*, 538 F.3d 693, 697 (7th Cir. 2008) (internal quotation marks omitted). And, as the seventh circuit has noted, "it is impossible sensibly to discuss the question whether a physician was acting outside the usual course of professional practice and without a legitimate medical purpose without mentioning the usual standard of care". *Id.* at 698.

Moreover, the circumstances at hand do not implicate *Christo*. "In [*Christo*], the defendant was charged with criminal misapplication of bank funds, but the indictment and trial evidence focused upon violations of a civil regulatory banking statute that concerned extending credit to bank officers." *Brown*, 553 F.3d at 791. The defendant asserted "an indictment may not charge nor the [G]overnment prove violations of a civil regulatory statute as the sole basis for alleged criminal misapplications of bank funds". *Id.* (citing *Christo*, 614 F.2d at 489). "This court agreed, finding that bootstrapping a criminal violation to a civil violation was plain error requiring reversal." *Id.*

By contrast, in this instance,

> the [G]overnment "both charged and proved a violation of the appropriate criminal statutes, not merely the related regulations[,]" and thus drew a proper contrast between the "irreproachable, commonplace use of duly issued regulations in clarifying the scope and contour of criminal laws [and] the inappropriate replacement of criminal laws with civil regulations."

*Bennett*, 874 F.3d at 245 (third alteration in original) (quoting *Brown*, 553 F.3d at 791 & n.71).

No. 18-20671

That Craig's above-described objection to the testimony regarding the Texas Medical Board's complaint was sustained does not alter this analysis because the court immediately instructed the jury "to disregard any testimony, evidence, and excerpts relating to the last brief line of questioning about the Texas Medical Board allegations". We, of course, presume the jury followed this instruction. *See, e.g.*, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (noting juries presumed to follow instructions); *see also United States v. Limones*, 8 F.3d 1004, 1008 (5th Cir. 1993) (citation omitted) (concluding immediate jury instruction to disregard evidence sufficient to affirm mistrial motion's denial).

C.

Appellants also raise a number of sentencing challenges. As stated, other than Faithful's challenge to the amount of his personal money judgment, these challenges also fail.

1.

For Craig's challenge to her sentence's procedural and substantive reasonableness, her advisory Sentencing Guidelines sentencing range was 960-months' imprisonment. She was, however, sentenced to, *inter alia*, 420-months' imprisonment.

Regarding procedural reasonableness, she asserts the court erred by relying on Guideline § 2D1.1(c)'s (Drug Quantity Table) Commentary Application Note 8(D) (Drug Conversion Tables), which equates one gram of hydrocodone to 6,700 grams of marihuana. According to Craig, this is a fictional equivalency for which the Sentencing Commission provided "no logical or explainable" rationale. As for substantive reasonableness, Craig contends: the court's using the Drug Conversion Tables resulted in her receiving a "grossly unfair" sentence; and we should exercise discretion to remand her

27

sentence for the court to make "defendant-specific" determinations based on her background and characteristics.

a.

Although post-*Booker* the Guidelines are advisory only, the district court must avoid significant procedural error, such as improperly calculating the Guidelines sentencing range. *Gall v. United States*, 552 U.S. 38, 46, 51 (2007). If no such procedural error exists, a properly preserved objection to an ultimate sentence is reviewed for substantive reasonableness under an abuse-of-discretion standard. *Id.* at 51; *see also, e.g., United States v. Delgado-Martinez*, 564 F.3d 750, 751–53 (5th Cir. 2009). In that respect, for issues preserved in district court, its application of the Guidelines is reviewed *de novo*; its factual findings, only for clear error. *E.g., United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008) (citation omitted).

Regarding Craig's procedural and substantive error claims, she moved in district court for a downward variance and objected to the procedural and substantive reasonableness of her sentence. Her challenges were, therefore, preserved.

b.

That said, Craig's sentence is neither procedurally nor substantively unreasonable.

i.

As for procedural reasonableness, Amendment 793 to the Guidelines Manual, which revised the Drug Conversion Tables to include the challenged hydrocodone-to-marihuana equivalency, explained in detail the Sentencing Commission's equating one gram of hydrocodone to 6,700 grams of marihuana. *See* Supp. to Guidelines App. C, Am. 793 (pp. 105–07). It explained, *inter alia*:

> In setting the marihuana equivalency, the Commission considered:  potency of the drug, medical use of the drug, and

28

patterns of abuse and trafficking, such as prevalence of abuse, consequences of issue including death or serious bodily injury from use, and incidence of violence associated with its trafficking. . . . Scientific literature, public comment, and testimony supported the conclusion that the potency, medical use, and patterns of abuse and trafficking of hydrocodone are very similar to oxycodone. In particular, the Commission heard testimony from abuse liability specialists and reviewed scientific literature indicating that, in studies conducted under standards established by the Food and Drug Administration for determining the abuse liability of a particular drug, the potencies of hydrocodone and oxycodone when abused are virtually identical, even though some physicians who prescribe the two drugs in a clinical setting might not prescribe them in equal doses. Public comment indicated that both hydrocodone and oxycodone are among the top ten drugs most frequently encountered by law enforcement and that their methods of diversion and rates of diversion per kilogram of available drug are similar. Public comment and review of the scientific literature also indicated that the users of the two drugs share similar characteristics, and that some users may use them interchangeably, a situation which may become more common as the more powerful pharmaceuticals recently approved by the Food and Drug Administration become available.

Based on proportionality considerations and the Commission's assessment that, for purposes of the drug guideline, hydrocodone and oxycodone should be treated equivalently, the amendment adopts a marihuana equivalency for hydrocodone (actual) that is the same as the existing equivalency for oxycodone (actual): 1 gram equals 6,700 grams of marihuana.

*Id.* at 107. And, it goes without saying the court did not err in relying on the Drug Conversion Tables in determining Craig's sentence. *See, e.g.*, *United States v. Koss*, 812 F.3d 460, 463 (5th Cir. 2016) (determining no error in district court's, *inter alia*, using Drug Conversion Tables when determining sentence).

ii.

Regarding substantive reasonableness, "[w]e apply a presumption of reasonableness to a below-Guidelines sentence". *United States v. Sifuentes*,

No. 18-20671

945 F.3d 865, 869 (5th Cir. 2019) (citation omitted), *cert. denied*, 2020 WL 1906704 (U.S. 20 Apr. 2020).   The presumption may be rebutted upon appellant's "demonstrat[ing] that the sentence:  (1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors" in 18 U.S.C. § 3553(a).   *Id.* (internal quotation marks and citation omitted).

Craig has not rebutted this presumption.   Her contention that her advisory Guidelines sentencing range is "grossly unfair" is unavailing; the court sentenced her to less than half her advisory range, and she does not contend the court otherwise failed to account for a significant sentencing factor, relied too heavily on an irrelevant or improper sentencing factor, or clearly erred in balancing sentencing factors.   *See id.* (citation omitted).

Moreover, she does not explain how the court, in determining her below-Guidelines sentence, did not already perform the defendant-specific analysis she seeks.   In fact, at sentencing the court:   stated Craig submitted "many letters" with her sentencing memorandum in support of her request for a downward variance; noted it "ha[d] read every letter that was submitted"; and referred to the letters, their authors, and their contents during sentencing, as well as other background information Craig included in her memorandum.

2.

Faithful "contends that the Sixth Amendment prohibits the practice of increasing a defendant's sentence based on judicially found facts, at least where, as here, the result is a sentence that would otherwise be substantively unreasonable".   According to Faithful, "[t]he proof at trial was at most sufficient to establish beyond reasonable doubt that the drugs delivered to 35 patients . . . were issued via prescriptions written for no legitimate medical purpose or outside the scope of professional practice", yet the court, under

30

No. 18-20671

current law, was improperly "permitted to find that the preponderance of the evidence established that every prescription written during the charged conspiracy was more likely than not unlawful".

As Faithful concedes, he did not preserve this contention in district court. Yet again, review is only for plain error. *E.g.*, *Delgado*, 672 F.3d at 328–30. In any event, Faithful also correctly concedes his contention is foreclosed. *See United States v. Hebert*, 813 F.3d 551, 564 (5th Cir. 2015) ("[C]ourts can engage in judicial factfinding where[, as here,] the defendant's sentence ultimately falls within the statutory maximum term".). Consequently, as stated in his opening brief on appeal, Faithful "raises the issue here solely to preserve it for possible further review".

3.

For the personal money judgment against Faithful, the Government on 4 September 2018 filed its motion for a preliminary order of forfeiture requesting such judgments against both appellants. In doing so, the Government sought equivalent personal money judgments of $3,332,000 against both Craig and Faithful. It derived this amount from appellants' equally splitting Gulfton's daily proceeds, which it calculated to total $6,664,000, based on, *inter alia*, an estimated payment of $340 per Gulfton prescription.

The court sentenced both appellants individually on 20 September. At sentencing, Faithful did not object to the requested $3,332,000 money judgment. (As referenced below, Faithful's trial counsel's 21 September motion to withdraw was granted on 24 September.) The court on 27 September entered a preliminary order of forfeiture against Faithful, including a money judgment in the Government's requested amount. The court entered a final forfeiture order on 11 January 2019.

No. 18-20671

Craig, however, did object at her sentencing to the Government's seeking a money judgment. The court gave her an opportunity to respond to the Government's motion for a preliminary order of forfeiture, and she filed her objections on 4 October. Her response objected, *inter alia*, to the Government's using $340 as the estimated value of a Gulfton prescription, asserting: the court had previously adopted her PSR's estimating the value of each Gulfton prescription at $300; and using $300, rather than $340, per prescription to calculate the clinic's daily proceeds resulted in a money judgment of $2,940,000. The Government responded to Craig's objection, conceding "the PSR states that the average charge for the drugs was $300 per patient" and "amend[ing] its motion to request a personal money judgment . . . of $2,940,000". But, regarding Faithful, the Government then stated:

> A money judgment in the amount of $3,332,000 . . . was imposed against . . . Faithful, in reliance on the original calculations in the motion, as Faithful did not object. Faithful has filed a notice of appeal and is not currently represented by counsel, and the United States is not seeking to modify his money judgment order at this time. Given the finding adopted from the PSR, however, the United States does not intend to enforce the money judgment against Defendant Faithful past the amount of $2,940,000.

The court on 15 October entered a preliminary forfeiture order against Craig, including a personal money judgment for $2,940,000. As it did for Faithful, the court similarly entered a final order of forfeiture against Craig on 11 January 2019.

Faithful challenges his personal money judgment, asserting its correct amount is $2,940,000, not $3,332,000, because the court had also previously accepted the factual finding from his PSR that the estimated value of a Gulfton prescription was $300, not $340.

32

No. 18-20671

a.

But, review is only for plain error. Faithful (as he concedes) did not object in district court to the money-judgment amount. *E.g.*, *Delgado*, 672 F.3d at 328–30. And, as stated, on plain-error review Faithful must show a forfeited plain error (clear or obvious error, rather than one subject to reasonable dispute) that affected his substantial rights. *Puckett*, 556 U.S. at 135 (citations omitted). "An error is considered plain, or obvious, for purposes of this court's plain[-]error inquiry only if the error is clear under existing law." *United States v. Maturin*, 488 F.3d 657, 663 (5th Cir. 2007) (citation omitted). Also, "[a]s a general rule, an error affects a defendant's substantial rights only if the error was prejudicial", meaning "there is a reasonable probability that the result of the proceedings would have been different but for the error". *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 363 (5th Cir. 2010) (citations omitted). Again, if Faithful makes these showings, we have the discretion to correct such reversible plain error but generally should do so only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings". *Puckett*, 556 U.S. at 135 (citation omitted).

In its brief on appeal, "the [G]overnment agrees that the lower [$300] is appropriate and that the correct amount of [Faithful's] money judgment should be $2,940,000" and "does not oppose a limited remand for the sole purpose of adjusting Faithful's forfeiture money judgment". Even so, "we must give the issue independent review". *United States v. Suarez*, 879 F.3d 626, 635 (5th Cir. 2018) (internal quotation marks and citation omitted). Upon such review, we agree a limited remand is warranted to reduce Faithful's personal money judgment to $2,940,000.

b.

Faithful and the Government are correct that the amount of his money judgment is in error because the court had previously accepted the lower $300

33

No. 18-20671

estimated value for a Gulfton prescription from Faithful's PSR as compared to the $340 value the Government used in calculating the amount of his money judgment.  Moreover, this error was plain, as our law is clear that "[t]he amount of a personal money judgment is measured *by the proceeds* of the defendant's illegal activity", *United States v. Nagin*, 810 F.3d 348, 353 (5th Cir. 2016) (emphasis added) (citation omitted), and using an estimated value of $340 per Gulfton prescription led to an overdetermination of the proceeds in this instance.  In addition:  the error was obviously prejudicial to Faithful, as shown by the reduced money judgment entered against Craig and the Government's concession as to the proper, reduced money-judgment amount; and allowing the incorrect money judgment to stand implicates the fairness, integrity, and public reputation of judicial proceedings.  *See* Fed. R. Crim. P. 32.2(b)(1)(A) ("If the [G]overnment seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay."); *id.* 32.2(b)(1)(B) ("The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable."); *United States v. Sanjar*, 876 F.3d 725, 748–50 (5th Cir. 2017) (exercising discretion on plain-error review to vacate forfeiture money judgment in excess of defendant's proceeds); *see also, e.g.*, *United States v. Austin*, 479 F.3d 363, 373 (5th Cir. 2007) ("When a defendant is ordered to pay restitution in an amount greater than the loss caused, the error affects substantial rights as well as the fairness and integrity of the judicial proceeding." (citations omitted)); *United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005) (vacating restitution order on plain-error review and remanding for modification when error caused "variance of over $70,000").  Therefore, we exercise our discretion to correct this error.

No. 18-20671

## III.

For the foregoing reasons, Craig's and Faithful's convictions and sentences are AFFIRMED; Faithful's personal money judgment is VACATED IN PART; and this matter is REMANDED for the limited purpose of the district court's amending the amount of the personal money judgment against Faithful consistent with this opinion.

Judge Haynes concurs in the judgment only.